Robert T. Eglet; NV Bar No. 3402
Artemus W. Ham, IV; NV Bar No. 7001
Erica D. Entsminger; NV Bar No. 7432
**EGLET ADAMS EGLET HAM & HENRIOD**
400 South Seventh Street, Suite 400
Las Vegas, NV 89101
Telephone: (702) 450-5400
Facsimile: (702) 450-5451
eservice@egletlaw.com

*Proposed Interim Counsel for Plaintiffs and the Proposed Class*

[Additional attorneys listed on signature page]

Brent W. Johnson (*pro hac vice* forthcoming)
Benjamin Brown (*pro hac vice* forthcoming)
Robert W. Cobbs (*pro hac vice* forthcoming)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
bjohnson@cohenmilstein.com
bbrown@cohenmilstein.com
rcobbs@cohenmilstein.com

Michael Eisenkraft (*pro hac vice* forthcoming)
Christopher Bateman (*pro hac vice* forthcoming)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, New York 10005
Tel: (212) 883-7797
meisenkraft@cohenmilstein.com
cbateman@cohenmilstein.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

ANDREW CAPLEN INSTALLATIONS LLC, and EDWARD ALLEGRETTI, D/B/A ALFRED AUTO CENTER, Individually and on Behalf of All Others Similarly Situated,

        Plaintiffs

        vs.

PERMIAN RESOURCES CORP. f/k/a CENTENNIAL RESOURCE DEVELOPMENT, INC.; CHESAPEAKE ENERGY CORPORATION; CONTINENTAL RESOURCES INC.; DIAMONDBACK ENERGY, INC.; EOG RESOURCES, INC.; HESS CORPORATION; OCCIDENTAL PETROLEUM CORPORATION; and PIONEER NATURAL RESOURCES COMPANY,

        Defendants

Case No:

**CLASS ACTION COMPLAINT FOR DAMAGES, EQUITABLE AND INJUNCTIVE RELIEF**

**JURY TRIAL DEMANDED**

1

Plaintiffs Andrew Caplen Installations LLC and Edward Allegretti, d/b/a Alfred Auto Center, individually and on behalf of all similarly situated persons and entities, bring this antitrust class action lawsuit for treble damages and injunctive relief against Defendants Permian Resources Corporation f/k/a Centennial Resource Development, Inc.; Chesapeake Energy Corporation; Continental Resources Inc.; Diamondback Energy, Inc.; EOG Resources, Inc.; Hess Corporation; Occidental Petroleum Corporation; and Pioneer Natural Resources Company (collectively "Defendants").

## I.    NATURE OF ACTION

1.    This action arises from Defendants' conspiracy to coordinate, and ultimately constrain, domestic shale oil production, which has had the purpose and effect of fixing, raising, and maintaining the price of crude oil in and throughout the United States of America (and worldwide). Defendants have also conspired with the Organization of the Petroleum Exporting Countries ("OPEC"), the international oil cartel that believes that it can escape U.S. antitrust law because its members are sovereign nations. Defendants agreed with OPEC to constrain production of crude oil worldwide, with the purpose and effect of fixing, raising, and maintaining the price of crude oil in and throughout the United States of America (and worldwide). Defendants are not sovereign nations, and they are not immune to U.S. antitrust law.

2.    Crude oil is the main input into gasoline and diesel fuel.[1] The price of crude oil is the main determinant of the price of gasoline and diesel fuel at the pump, with approximately 90% of variation in the price of these fuels directly related to the price of crude. For all intents and purposes, a conspiracy to raise crude oil prices is also a conspiracy to raise the prices of gasoline and diesel fuel.

---

[1]    Throughout this complaint, references to "gasoline" are to retail gasoline, including but not limited to all grades and formulations sold to individual commercial end-users at retail gasoline stations throughout the U.S. "Diesel fuel" refers to No. 2 distillate diesel fuel sold at retail.

3.     This is not a conspiracy in which the Defendants subtly raised prices by a nearly-insignificant amount, cheating their customers by a few pennies to accumulate millions or tens of millions of dollars to themselves. Though the exact effects of the conspiracy are yet to be determined, one can get a rough idea of the enormous impact this conspiracy had on gas and diesel prices just by looking at a graph:

**Weekly Retail Gasoline and Diesel Prices**



Data source: U.S. Energy Information Administration

4.     Plaintiffs seek to represent classes of persons and entities that, like themselves, paid artificially inflated prices for motor vehicle fuel they purchased for commercial use. Gasoline and diesel fuel are a major cost of businesses small and large, from sole-proprietor taxicab companies and electricians to thirty-person landscaping companies to major long-haul trucking businesses employing thousands of drivers. Class members purchase *millions* of gallons of gasoline and diesel for commercial use *every day*. Running a business—especially one that depends on inputs as cost-variable as fuel—is difficult and risky in the best of circumstances.

Defendants have been making it harder, violating the law to misappropriate *billions* of dollars that should belong to class members.

*\*\*\**

5.      Shale oil, also called "tight oil," can be found between layers of shale rock, impermeable mudstone, or siltstone that can be extracted, refined, and used to produce gasoline, diesel fuel, and other commercial products sold in the U.S. Shale oil is produced by fracturing the rock formations that hold the layers of oil. This process is known as hydraulic fracturing, or "fracking."

6.      Shale oil is a relatively new business, and its rise has sent earthquakes through the world economy. Major commercial "fracking" of shale formations began around 1998, but early applications were almost all targeted at natural gas deposits, which were more economically recoverable. Some shale oil was produced in connection with these projects (natural gas and oil are often present in the same wells) and in particularly economical areas, but volumes of shale oil remained insubstantial until 2011 or 2012, when it suddenly took off:



7.    This chart, from a report written in 2015 for the European Central Bank,[2] predicted substantial growth in shale oil volumes. In truth, it dramatically *underestimated* its rise; today, shale oil comprises almost two-thirds of the onshore production of crude oil in the United States.[3]

8.    Refineries purchase shale oil, along with other crude oil. They co-mingle shale oil produced by Defendants with other shale oil, as well as crude oil extracted from traditional drilling methods, then refine the crude oil into gasoline, diesel and other petroleum-based products. Crude oil is the main upstream input in gasoline and diesel fuel.

9.    Refined gasoline and diesel fuel is transported to storage terminals, where the fuel is stored and blended prior to sale to gas stations and truck stops that make up the over 145,000 retail fuel outlets across the U.S., for onward sale to the commercial-use class members and other retail customers.

10.    Domestic independent shale producers ("Independents") are companies that mostly focus on the exploration, development, and production of domestic shale resources. Independents are distinct from large vertically integrated energy companies, like Chevron and ExxonMobil (known as "supermajor(s)"), with diverse global operations encompassing the exploration, production, refining, and distribution of various energy resources. By way of example, in 2019, just 7% of Chevron's total global crude oil produced was from U.S. shale operations.

11.    Defendants Permian Resources Corp. f/k/a Centennial Resource Development ("Centennial"), Chesapeake Energy Corporation ("Chesapeake"), Continental Resources Inc. ("Continental"), Diamondback Energy, Inc. ("Diamondback"), EOG Resources, Inc. ("EOG"), Hess Corporation ("Hess"), Occidental Petroleum Corporation ("Occidental"), and Pioneer Natural Resources Company ("Pioneer"), collectively "Defendants," are among the largest

---

[2]    Cristiana Belu Mănescu and Galo Nuño, *Quantitative Effects of the Shale Oil Revolution*, European Central Bank Working Paper Series No. 1855 (Sept. 2015) at 28, https://www.ecb.europa.eu/pub/pdf/scpwps/ecbwp1855.en.pdf.

[3]    *How Much Shale (Tight) Oil is Produced in the United States?*, EIA (Mar. 27, 2023), https://www.eia.gov/tools/faqs/faq.php?id=847&t=6.

Independents. Since the shale boom, Independents have acted as "swing producers" for the global oil market, with the ability to adjust shale oil production levels rapidly in response to changes in market conditions and push, or "swing," the price of crude oil.

12.    Historically, successful Independents have specialized in *racing:* They race to acquire the rights to drill in newly discovered shale plays;[4] they race to drill wells as fast as possible; they race to secure fracturing and production services that bring wells onto production. The profitability of shale oil projects often depends on timing and volume—shale wells are usually shorter-lived than their conventional counterparts, and relatively more expensive over the life of the project—so successful companies are those that spin up new projects fast in response to economically viable oil prices. "In a shale play if you stop running, you will fly off the back of the treadmill," one former oil executive told the *Financial Times.* "Just to stay still, you've got to do a lot of drilling."[5]

13.    After years of low prices driven by the increasing efficiency and volume of shale oil production, culminating in a bizarre day in April 2020 in which the price of spot crude oil dropped to *negative* $36 a barrel,[6] crude oil prices in the US began a steady upward rise beginning on or around January 2021, reaching prices not seen since before the shale boom began to affect world prices that continue to the present day. Crude oil prices today are well above the economical levels for shale oil production. Basic principles of supply and demand dictate that, in their role as swing producers, Defendants should have been in full "race" mode since that time, drilling furiously and increasing production to capitalize on this price rise.

---

[4]    A shale "play" refers to a geologic formation containing significant hydrocarbon resources and, by extension, the surface region above the formation where drilling companies extract those resources. For example, the "Bakken Shale play" refers both to an oil-rich section of Late Devonian/Early Mississippian deposited between approximately 360 million years ago, but also to roughly 200,000 square miles of land in North Dakota, Montana, Saskatchewan and Manitoba from which it can be drilled.

[5]    *US Shale Oil: Can a Leaner Industry Ever Lure Back Investors?* FINANCIAL TIMES (Feb. 1, 2021), https://www.ft.com/content/a8d72d4d-09b1-47fb-bb6c-3c314770f1c1.

[6]    Crude oil supply is measured by the number of "barrels" produced, each of which contains 42 gallons of crude oil. Daily oil production is measured in barrels per day, which is at times abbreviated as bpd, but is also b/d or B/D. Production over longer periods is often measured in millions of barrels, abbreviated as MMbbl.

Instead, Defendants collectively decided *not* to increase their U.S. shale oil production, and prices remain high.

14.    The agreement among Defendants to curb U.S. shale oil production is part and parcel of their cooperation and collusion with OPEC, the international cartel of large oil producing nations, who also sought to raise oil prices by managing oil production during this period.

15.    Defendants met and communicated regularly with each other, and with OPEC between 2017 and 2023. They sought to coordinate their collective oil output in response to market conditions. After their meetings, representatives from Defendants repeatedly offered public statements confirming these discussions and the exchange of confidential information. Specifically, Defendants also confirmed that they discussed with each other and OPEC their production strategies, future investment plans, and price targets. Likewise, when publicly discussing their meetings with Defendants, OPEC officials spoke favorably of the cooperative nature of their developing relationship with Defendants.

16.    Defendants' executives, leaning into the wildcat reputations of their firms, described these meetings in unusually frank terms. Diamondback CEO Travis Stice, for instance, described a meeting among shale producers and OPEC as an "open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production and the associated balance of what's going on in our industry." Reuters reported that in the runup to another meeting, a shale CEO crowed: **"We now have a seat at the table on pricing."**

17.    Unaccustomed to concern with antitrust laws, however, OPEC officials were even more frank about their collusive meetings with Defendants: In an official OPEC bulletin describing one meeting, for example, OPEC Secretary General Mohammead Sanusi Barkindo said, "We had a very open, frank, and lively conversation[] on [the] current state of the cycle and we also compared note[s] from our experiences during these cycles, how we should proceed going forward." On a panel with Hess Oil CEO John Hess, Secretary Barkindo was even more explicit: **"We have to continue to collaborate. It's one industry. It's a global industry, and I think our colleagues in the U.S. are on the same page with us and we will work together to**

**exchange views."**

18.     From 2017 when the meetings between U.S. shale producers and OPEC began until the onset of the COVID-19 pandemic, worldwide oil prices and supply remained relatively stable and lower as OPEC and the Defendants warily negotiated production cuts. Defendants wanted OPEC to cut production to benefit all producers; OPEC insisted that Defendants reduce production as well, rather than "free riding" on OPEC's cuts.

19.     COVID-19 was an exogenous shock to oil markets as demand dropped precipitously. By early 2021, however, demand was rebounding dramatically and crude oil prices increased steadily, jumping again with the Russian invasion of Ukraine in February 2022. This extended run of unprecedentedly high crude oil prices provided ideal market conditions for agile swing producers like Defendants – whose breakeven prices have never been lower and who operate in regions with a wealth of profitable opportunities – to aggressively increase production.

20.     Defendants, however, did not take advantage of this market opportunity. Instead, departing from their historical practice and rational independent self-interest, each Defendant limited their domestic shale production growth.

21.     Absent mutual promises among themselves to cut production, no Defendant would fail to respond to these price signals. The shale oil market would once again boom, and producers would do what they have always done in boom times: make every effort to cash in on the boom while it lasted. Indeed, this is exactly what small independent shale producers, without enough market share to earn the ire of the cartel, are doing today.

22.     The agreement among Defendants to limit their respective shale production volumes has had the effect of fixing and/or stabilizing at an artificially high-level U.S. (and global) crude oil prices, which in turn fixed and/or stabilized retail gasoline and retail diesel fuel prices in the United States at an artificially high level.

23.     Their cartel is a *per se* unlawful restraint of trade under numerous state antitrust and competition laws. Plaintiffs and the Classes suffered substantial harm as a result of the supracompetitive prices they paid for retail gasoline or retail diesel for commercial use as a direct and proximate result of the cartel to constrain domestic production of shale oil in the

1  United States. They bring this suit to recover that loss.

2  **II.    PARTIES**

3      24.    Plaintiff Andrew Caplen Installations LLC is a Pennsylvania-based installation

4  company. Plaintiff is headquartered at 3811 Pricetown Road, Fleetwood, Pennsylvania 19522.

5  During the class period, Plaintiff purchased in states including Michigan and North

6  Carolina gasoline for commercial use, and has paid higher retail gasoline prices as a result of the

7  allegations alleged herein.

8      25.    Plaintiff Edward Allegretti, d/b/a Alfred Auto Center, is a New York-based

9  vehicle sales, maintenance, and towing business. Plaintiff is headquartered at 6989 State Route

10  21, Almond, NY 14804. During the class period, Plaintiff purchased in the state of New York

11  gasoline and diesel fuel for commercial use, and has paid higher retail gasoline and diesel fuel

12  prices as a result of the allegations alleged herein.

13      26.    Defendant Permian Resources Corporation is a publicly traded Delaware

14  corporation headquartered in Midland, Texas. It is a major producer of crude oil from shale oil

15  formations, largely in the Permian Basin in Texas and New Mexico. Permian was formed in

16  2022 in a transaction between Centennial Resource Development, Inc. ("Centennial") and

17  Colgate Energy Partners III, LLC; during most of the period relevant to this complaint, it was

18  known as Centennial. It sells crude oil into the U.S. domestic market where it is refined and

19  disseminated across the country. Its common stock trades on the New York Stock Exchange

20  under the "PR" ticker symbol.

21      27.    Defendant Chesapeake Energy Corporation ("Chesapeake") is a publicly traded

22  Oklahoma Corporation headquartered in Oklahoma City, Oklahoma. It is a major producer of

23  crude oil from shale oil formations, with operations in Louisiana and Pennsylvania. It sells crude

24  oil into the U.S. domestic market where it is refined and disseminated across the country. Its

25  common stock trades on the NASDAQ Stock Market under the "CHK," "CHKEW," "CHKEZ,"

26  and "CHKEL" ticker symbols.

27      28.    Defendant Continental Resources Inc. ("Continental") is an Oklahoma

28  Corporation headquartered in Oklahoma City, Oklahoma. It is a significant producer of crude oil

using shale oil formations, with operations in North Dakota, Montana, Oklahoma, Texas, and Wyoming. Continental sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Until November 22, 2022, its common stock traded on the New York Stock Exchange under the "CLR" ticker symbol. Thereafter, the company became privately owned by Harold Hamm, the company's founder, who purchased it through a series of take-private transactions with Omega Acquisition Inc.

29.     Defendant Diamondback Energy, Inc. ("Diamondback") is a publicly traded Delaware Corporation headquartered in Midland, Texas. It is a major producer of crude oil using shale oil formations in Texas. Diamondback sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the NASDAQ Stock Market under the "FANG" ticker symbol.

30.     Defendant EOG Resources, Inc. ("EOG") is a publicly traded Delaware Corporation headquartered in Houston, Texas. EOG is a major producer of crude oil from oil shale formations with operations covering North Dakota, Wyoming, Colorado, Oklahoma, Texas, New York, Pennsylvania, and New Mexico. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange under the "EOG" ticker symbol.

31.     Defendant Hess Corporation ("Hess") is a publicly traded Delaware Corporation headquartered in New York, New York. It is a significant producer of crude oil from shale oil formations in North Dakota. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange under the "HES" ticker symbol.

32.     Defendant Occidental Petroleum Corporation ("Occidental") is a publicly traded Delaware Corporation headquartered in Houston, Texas. It is a major producer of crude oil from shale oil formations in Colorado, Texas, and New Mexico. Occidental sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Occidental's common stock and warrants to purchase common stock  trade on the New York Stock Exchange under the "OXY" and "OXY WS" ticker symbols, respectively.

33. Defendant Pioneer Natural Resources Company ("Pioneer") is a publicly traded Delaware Corporation headquartered in Irving, Texas. Pioneer is a significant producer of crude oil from shale oil formations in Texas. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange under the "PDX" ticker symbol.

## III. AGENTS AND CO-CONSPIRATORS

34. Each and every Defendant was a co-conspirator with the other Defendants. Each committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District.

35. "Defendants," as used herein means each of Centennial, Chesapeake, Continental, Diamondback, EOG, Hess, Occidental, and Pioneer; unless stated otherwise, where an action by "Defendants" is alleged, it is alleged that each Defendant undertook the alleged action.

36. "Defendants," as used herein, refers to and includes each of the named Defendants' predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, employees, officers, or agents.

37. Though each Defendant may have subsidiaries and affiliates with separate corporate forms, each Defendant's officers, employees and agents habitually refer to the Defendant and its subsidiaries collectively, not making legal distinctions among related corporate entities. Whenever reference is made to any act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

38. Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions, for whom they are liable.

39. Co-conspirators known and unknown willingly participated in the alleged conspiracy and acted in furtherance thereof.

**IV.    JURISDICTION, VENUE, AND COMMERCE**

40.    This action arises under Section 1 of the Sherman Act (15 U.S.C. §1), and Section 16 of the Clayton Act (15 U.S.C. §26), as well as the antitrust, fair competition, and consumer protection laws of various states. The Sherman Act claim is for injunctive relief, costs of suit, and reasonable attorneys' fees; the various state claims seek to recover injunctive relief, compensatory damages, treble damages, costs of suit, and reasonable attorneys' fees.

41.    This Court has subject matter jurisdiction over Plaintiffs' claim under Section 16 of the Clayton Act, 15 U.S.C. §26, and under 28 U.S.C. §§1331, 1333(d), 1337(a), and 1367.

42.    This Court has diversity jurisdiction over this action under 28 U.S.C. §1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and Plaintiff Andrew Caplen Installations LLC, a resident of Pennsylvania, is a citizen of a state different from Defendants, all of whom are either incorporated in Delaware or Oklahoma and headquartered in Texas, Oklahoma, or New York.

43.    This Court also has personal jurisdiction over all Defendants, and Venue in this District is proper, under the combination of 15 U.S.C. §22 and 28 U.S.C. §1391(b), (c), and (d). A substantial part of the events or omissions giving rise to the claim occurred in this District. On information and belief, each Defendant resides, transacts business, is found, or has an agent in this District.

44.    Defendants' activities were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

45.    By reason of the unlawful activities alleged herein, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed class members. Defendants, directly and through their agents, engaged in activities affecting all states.

46.    Defendants' conspiracy, wrongful anticompetitive conduct, and substantial anticompetitive effects described herein proximately caused injury to Plaintiffs and members of

the Classes.

## V.     FACTUAL ALLEGATIONS

### A.     The Organization of the Petroleum Exporting Countries ("OPEC") and Its Historical Control Over Crude Oil Prices

47.     OPEC is an intergovernmental organization comprised of oil-producing nations who explicitly cartelize the production of oil in an effort to allow its members to extract oligopolistic prices in the oil market. Its members purport to benefit from sovereign immunity to the Sherman Act, and historically the United States has not sought to prosecute OPEC or its members under the antitrust laws. OPEC nations control nearly 80% of the world's proven crude oil reserves and close to 40% of the world's oil production. Historically, OPEC exerted market power over global oil prices by coordinating its members' respective production levels. By increasing or decreasing production levels in response to demand and various policy considerations, OPEC effectively controlled prices. Other world oil producers took market prices and made production decisions in the shadow of those prices.

48.     Saudi Arabia has historically acted as OPEC's (and the world's) swing producer, able to rapidly increase production in response to changes in market conditions. Saudi Arabia maintains a margin of "spare capacity"—which the U.S. Energy Information Administration (EIA) defines as production that can be brought online within 30 days and sustained for at least 90 days—to make quick adjustments in production. The International Energy Agency (IEA) estimates that Saudi Arabia's spare capacity is currently about 3.22 million barrels per day—about 3 percent of global demand.[7] The entire OPEC cartel currently has spare capacity totaling about 5.14 Mmbd.[8] Saudi Arabia has the worldwide lowest marginal costs to produce oil, with estimates of production costs even for the highest-cost wells rarely exceeding $10.00 per barrel. In consequence, Saudia Arabia is the de facto leader of OPEC.

49.     As major shale oil supply from the United States began to hit the global market in

---

[7]     Int'l Energy Agency, *Oil Market Report – January 2024*, https://www.iea.org/reports/oil-market-report-january-2024.

[8]     *Id.*

the mid-2010s, however, OPEC lost a substantial portion of its control over prices: it could not lower production sufficient to maintain prices without losing substantial market share to shale-oil competitors and other global producers. This was a major problem for OPEC members, whose economies largely depend on maintaining a large market share of oil production priced at artificially high oligopoly prices.

50.      To beef up its cartelized market power, OPEC effectively expanded in December 2016, signing the first of several agreements with 10 other oil-producing nations to coordinate production and pricing. Most notable among these new signatories was Russia, which produces almost as much crude oil as Saudi Arabia, albeit at substantially higher cost. This expanded cartel is now known as "OPEC+" and controls nearly 60% of world production today.[9]

51.      The emergence of U.S. shale oil producers had shaken up the dynamics of world oil markets as dramatically as had the formation of OPEC in 1960. OPEC's scramble to exert control over oil prices by bringing new members into the fold—including, eventually, the shale oil producers themselves—was not by choice. A two-year price war with U.S. shale oil producers had demonstrated OPEC's reduced dominance in oil markets and driven the cartel to make room at the table for additional producers. That table soon included the Defendants here, who eagerly took their seats.

### B.      A "New Oil Order"

52.      The introduction of shale drilling in the early 2000s forever changed the oil and gas industry landscape. Though controversial, it achieved undeniable success: within eight years of the first commercial shale operation coming online in Texas in 2002, U.S. shale producers were pumping enough shale oil to reverse a 35- consecutive-year trend of declining U.S. domestic crude oil production. The seven years starting from 2008 represented the fastest increase in domestic crude oil production in U.S. history – the "Shale Revolution."[10]

---

[9]      *See* EIA, *What is OPEC+ and how is it different from OPEC* (May 9, 2023), https://www.eia.gov/todayinenergy/detail.php?id=56420.

[10]      A similar revolution in natural gas production from shale formations preceded the boom in oil; in 2000, shale gas accounted for 1.6% of U.S. production; by 2010, the figure was 23.1%.

53.    Shale oil was not a new discovery; shale fields had been occasionally exploited for commercial use since the 19th century.[11] The presence of hydrocarbons in shale formations was well known, but economically exploiting them was difficult. In the early 2000s, however, innovations in fracking and drilling technology allowed U.S. Independents to produce hydrocarbons economically in formations that had been hitherto ignored by the industry. Rapid improvements in three kinds of technologies, in particular, converged to start the fracking boom: horizontal drilling, 3-dimensional seismic imaging, and hydraulic fracturing.[12] Each of these improved the efficiency of drilling for hydrocarbons in "unconventional" plays.

54.    Horizontal drilling allowed a single well pad to collect hydrocarbons from a large area. Whereas traditional vertical drilling breaches a producing rock layer and collects oil from one point, horizontal drilling allowed wells to make a horizontal turn along a producing formation.[13] Though each horizontal well was more expensive than its conventional counterpart, the benefits from increased production vastly outstripped the additional cost. New imaging technologies, powered by contemporaneous advances in computer technology, allowed shale companies to target productive formations with much greater accuracy.[14] And dramatic improvements in the relatively old technology of hydraulic fracturing vastly increased well productivity.[15]

---

*See* Zhongmin Wang and Alan Krupnik, *A Retrospective Review of Shale Gas Development in the United States: What Led to the Boom?* (Resources for the Future Discussion Paper 13-12, Apr. 2013) at 1, https://web.archive.org/web/20150319084508/http://www.rff.org/RFF/documents/RFF-DP-13-12.pdf.

[11]    *See generally, e.g.*, S.J. Louw and J. Addison, *Studies of the Scottish Oil Shale Industry: History and Mineralogy*, Dept. of Energy Research Project No. DE-AC02-82ER60036 (Mar. 1985), https://web.archive.org/web/20110726125905/http://www.iom-world.org/pubs/IOM_TM8502.pdf.

[12]    *See* Wang & Krupnick, *supra* n.10, at 10.

[13]    *See* Lynn Helms, *Horizontal Drilling*, N.D. Dept. of Mineral Resources Newsletter (Winter 2008), https://www.dmr.nd.gov/ndgs/documents/newsletter/2008Winter/pdfs/Horizontal.pdf

[14]    Wang & Krupnick, *supra* n.10, at 13.

[15]    *Id.* at 12-13.

55.    By nature, shale fracking is a more granular, small-scale enterprise than the massive conventional projects that had previously dominated the oil and gas industry. Those projects sought out massive reservoirs that would produce enormous quantities over a long time; by the 2000s, such projects generally required enormous capital outlays to reach technically, politically, or infrastructurally-complicated sources of oil and gas. These projects often took years of planning and construction to reach out-of-the-way fields at scale. Shale drilling, by contrast, typically involves drilling many smaller and less productive wells very efficiently on a short timeline. Along with the major technological advances that made shale drilling possible, shale drilling companies developed hundreds of smaller innovations from drilling technology to business logistics, each of which shaved important dollars off the capital outlay required to reach shale oil and gas.



56.    Importantly, many of these innovations were developed and perfected during the shale *gas* boom that began in 2000 and had upended natural gas markets by 2005 or 2006. High natural gas prices had led shale companies to target gas-rich formations first; by the time oil prices incentivized U.S. independents to target shale oil in the 2010s, the companies had already honed very fast and efficient drilling methods.

57.    The technological and business efficiency expertise that allowed U.S. shale oil producers to succeed also posed a unique problem for OPEC. Shale oil wells: (a) require smaller capital commitments; (b) can be drilled in two to four weeks; (c) can be brought online within months; and (d) allow for production to be comparatively front-loaded. Consequently,

production of crude oil from shale wells is more responsive to changing prices and real-time market conditions than traditional drilling methods used by supermajors.

58.    These factors gave U.S. Independents unprecedented ability to compete with OPEC and control oil prices. Within months of oil prices reaching economically viable levels, Independents could respond by ramping up production to take advantage of those prices. They could bring supply to market fast enough and in sufficient volume that they could replace supply constrained by OPEC production quotas. U.S. Independents could effectively "free ride" on OPEC's oligopolistic behavior, diminishing the monopoly rents OPEC could extract from their control over supply in the market.

59.    Unlike OPEC (at least as a practical matter), U.S. shale oil producers are subject to the Sherman Act. This meant that while U.S. shale oil production would come to rival the largest OPEC and OPEC+ nations,[16] the industry was not a monolith that traditionally set prices or production levels industry-wide. Rather, as a boon to gasoline and diesel commercial purchasers like Plaintiffs and members of the proposed classes, U.S. shale producers were a group of relatively smaller producers who did not hesitate to compete with each other and with OPEC.

60.    In the early-to-mid-2010s, U.S. shale's arrival on the global oil scene thus presented a stark threat to the market control OPEC had maintained for decades. The U.S. shale industry was dubbed "Cowboyistan," a nod to its power as an oil producer and its wild West approach to drilling. A "new oil order" had emerged. The aggressive competition of U.S. shale producers usurped the Saudi swing producer role, and saw U.S. domestic production erode OPEC-set cartel price premiums.

**C.    The 2014-2016 "OPEC Price War"**

61.    The OPEC sovereign nation-states have GDPs (and, in some cases, currencies) heavily reliant on crude oil prices. They and OPEC itself were not about to willingly cede the

---

[16]    Because of the shale oil boom, the United States is today by far the world's largest supplier of oil, producing some 20 Mmbd in 2022, with Saudi Arabia and Russia next at 12 Mmbd and 10 Mmbd, respectively. Shale oil is roughly 2/3 of U.S. production.

1    pricing power OPEC had held over global oil prices for a half-century to U.S. shale producers.

2        62.    Rather than engage the Independents to effectively join its cartel (as far as can be

3    publicly known), OPEC determined at some point in 2014 that the Independents had captured

4    too much OPEC market share and were too much of a drain on its monopoly rents. It set out to

5    leverage its control over the cheapest-to-produce oil in the world to destroy the U.S. shale

6    industry.

7        63.    Beginning in mid-2014, OPEC began to manage its production quotas to push oil

8    prices to a level that would render U.S. shale oil no longer economically viable, while

9    maintaining prices high enough to satisfy the political needs of its members. Thus began more

10   than two years of relatively open global competition, which the industry recognized as the

11   "OPEC Price War." The price of crude oil (and retail gasoline and diesel) plummeted as shale

12   producers and OPEC nations sold oil into the market at prices not seen since the demand shock

13   of the Great Recession:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17    64.    But OPEC failed to drive the U.S. shale oil industry out of business. As prices

18  dropped, shale producers developed more ways to cut costs and increase productivity, driving

19  breakeven points lower. At the beginning of the price war, the average shale oil breakeven point

20  (the point at which it makes economic sense to drill) was $82 per barrel. By 2018, it was $47,

21  and by 2021, $37. These innovations allowed Independents to exploit less productive shale plays

22  profitably.

23    65.    Consequently, by implementing cost-cutting measures and focusing on the most

24  productive shale plays to remain competitive in the lower-price environment, many U.S. shale

25  producers, including Defendants, continued to drill at consistent levels despite the price drop

26  caused by OPEC's price war. They held on through the long period of low prices, playing

27  chicken with OPEC (whose members, usually depending heavily on oil revenues to support their

28  economies, were also hurting from low prices). They waited, ready to add supply whenever

prices improved.[17]

66.    Many U.S. Independents *were* driven out of business, merging with larger players or going bankrupt in the face of low prices and high debts. But several large players, including the Defendants, maintained their position. Rather than killing the U.S. shale oil industry, the OPEC price war consolidated it, causing dozens of smaller Independents to fail and creating a sense of shared mission to hold the line among companies that had often been intense competitors.

### D.    Détente: The U.S. Independents Take "A Seat at the Table on Pricing"

67.    Weary after years of low prices that yielded little result,[18] OPEC changed tactics. First, as noted above, in December 2016, it struck a deal with 10 non-OPEC oil producing nations to form OPEC+. This brought its global market share to nearly 60% and allowed the cartel to share production cuts with former competitors, especially Russia. Having brought one enormous potential competitor and several smaller ones into the fold, OPEC turned renewed attention toward Cowboyistan.

68.    Unable to beat U.S. shale producers in the free market, OPEC initiated a years-long campaign to orchestrate a détente in the price war and bring them into the cartel. The negotiations were tricky; U.S. Independents, used to free riding on OPEC cartel prices, thought the cartel should just slash their own production and raise prices, allowing U.S. producers to reap the benefits. OPEC, of course, wanted to minimize free riding and demanded that U.S. companies forego some opportunities to produce oil at a profit, as the other OPEC members routinely did. The negotiations were complicated further by the need to coordinate U.S.

---

[17]    *See* Steven Mufson, *Is the Oil World Big Enough for Two Swing Producers?*, THE WASH. POST (Sept. 29, 2016), https://www.washingtonpost.com/business/economy/is-the-oil-world-bigenough-for-two-swing-producers/2016/09/29/ce4e96f0-85f7-11e6-a3eff35afb41797f_story.html (noting that "the companies in [the U.S. shale industry] are ready to add production every time the price starts creeping up" and attributing to Defendant Pioneer CEO Scott Sheffield a promise that if oil prices moved above $60 a barrel, the U.S. Shale industry would respond by ramping up production)

[18]    *Id.* (as a result of the ongoing price war, OPEC "regained some market share and put a floor under prices. But its success has been slow, limited and remains fragile. And the price [$45-$55 a barrel at that time] is still half of where they'd like it to be.").

production cuts among a significant group of shale oil producers who were supposed to compete with each other; a major defector among the big Independents would undercut the benefits of cooperation for the others and for OPEC.

69.    Independents were open to cartelization, though. They, too, had grown weary of the price war, and they made overtures in startlingly unsubtle ways. As reported by MarketWatch on September 8, 2016, for example, "Shale-oil baron [and Defendant Continental's CEO] Harold Hamm thinks major crude-oil producers need to settle on a plan to stabilize oil prices sooner than later." Hamm, "calling for a freeze of production . . . said it is 'high time' for Russia and the Organization of the Petroleum Exporting Countries to forge a pact that would put an end to [the] slide in crude oil prices."[19] By maintaining their ground during the price war, Hamm and Defendants had gained leverage over OPEC. Now, Hamm was signaling to OPEC that Continental and the other Defendants were willing to play ball.

70.    Soon thereafter, in early 2017, Defendants and members of OPEC began meeting and sharing dinners together.[20] These multilateral meetings took place at oil industry events around the globe—especially at the CERAWeek Conference, an energy-focused event held annually in Houston, Texas.

71.    The first of these dinners took place at the 2017 CERAWeek Conference, held March 6-10 in Houston. OPEC's General Secretary Mohammed Barkindo "dined with about two dozen[] U.S. shale executives on the sidelines of [the 2017] CERAWeek conference, including Scott Sheffield of [Defendant] Pioneer Natural Resources, Co., John Hess of [Defendant] Hess Corp., Doug Lawler of [Defendant] Chesapeake Energy Corp. and Tim Leach of Concho

---

[19]    Mark DeCambre, *Harold Hamm Says It Is 'High Time' for an OPEC Pact to Freeze Output*, MARKETWATCH (Sept. 8, 2016), https://www.marketwatch.com/story/trumps-potentialenergy-czar-says-its-high-time-for-an-opec-pact-to-freeze-output-2016-09-08.

[20]    Liz Hampton, *As Oil Prices Soar, U.S. Shale, OPEC in no Rush to Resume Price War*, REUTERS (Mar. 10, 2022), https://www.reuters.com/business/energy/ceraweek-oil-prices-soar-usshale-opec-no-rush-resume-price-war-2022-03-10 (OPEC began hosting regular dinners and events in 2017 "to better understand private sources of financing that allowed new companies to emerge" and "[o]ver time, the dinners grew more collegial.").

Resources Inc."[21] OPEC had purportedly never before met with U.S. shale producers, leading to reporters describing the meeting as "unusual."[22] Meetings during the March 2017 CERAWeek Conference "opened a communication channel between the shale companies and OPEC countries."[23] Soon after, Scott Sheffield of Defendant Pioneer said he's seeing a profound thawing in the relations between [OPEC] and shale producers. 'I'm seeing a series of meetings where OPEC is reaching out and spending more time with U.S. independents than I have seen over my entire career,' Sheffield said."[24]

72.    Bloomberg described the 2017 CERAWeek meeting as a "Dinner Détente,"[25] and reported that **"The sides agreed in principle that the market should be better balanced and lower inventories would be beneficial to everyone."**[26]  Exactly who would bear the costs of those lower inventories remained a matter of contention: shale companies "signaled they weren't ready to give up on the growth they [saw] ahead."[27] OPEC, in turn, affirmed its willingness to cut shale producers into the cartel; according to Bloomberg, at the dinner "OPEC indicated it wants higher prices, even if it means enriching the shale companies."[28]

73.    The dinner involved an exchange of competitively sensitive forward-looking information between the shale producers and the cartel:

> "They're trying to understand our business model," Sheffield said of OPEC officials. "I think they're trying to understand more about our *ability to produce*, what the cost structure is *and what's going to happen over the next several years*.

---

[21]    Javier Blas & Grant Smith, *OPEC Head to Meet with U.S. Shale Producers for Dinner Next Week*, BLOOMBERG (Feb. 27, 2018), https://www.bloomberg.com/news/articles/2018-02-27/opec-head-to-meet-u-s-shale-oil-producers-for-dinner-next-week.

[22]    *Id.*

[23]    *Id.*

[24]    David Wethe, *Oil to Hit $40 if OPEC Fails to Expand Cuts, Pioneer Says*, BLOOMBERG, (Mar. 7, 2017). https://www.bloomberg.com/news/articles/2017-03-07/pioneer-s-sheffield-sees-40-oil-if-opec-doesn-t-extend-cuts.

[25]    *Id.*

[26]    Javier Blas, *OPEC Said to Break Bread With Shale in Rare Show of Détente*, BLOOMBERG (Mar. 7, 2017), https://www.bloomberg.com/news/articles/2017-03-07/opec-said-to-break-bread-with-shale-in-rare-show-of-detente (emphasis added).

[27]    *Id.*

[28]    *Id.*

In return, shale producers are talking with OPEC to learn about the members' thought process towards the price of oil over the next several years, what supplies the different members have themselves, and whether inventories are falling, he said. "It helps us plan long term," Sheffield said.[29]

Defendant Hess's CEO, John Hess, confirmed that the dinner was no mere listening session: "**It was a very good exchange of information and views about oil** . . . . It was a good talk," he told Bloomberg.[30]

74.    The boldness of this kind of information exchange with what is probably the world's most infamous cartel is breathtaking. Information about costs, inventories, capacity, and production is the foundation for cartel negotiations, because it establishes what the competitive terrain would look like in the absence of coordinated production cuts. Discussions of forward-looking production and capacity information are, of course, only a hair's breadth from *agreements* on future production levels—effectively setting prices as well. Indeed, after the meeting, "Sheffield said his impression is that OPEC would like to see oil stabilize between $50 and $60, with a preference toward the higher end."[31] Though this meeting was (apparently) only the start of negotiations among some of the hardest bargainers in the world, the stage was set.

75.    While attending CERAWeek 2017, OPEC and the U.S. shale producers "agreed in principle that the market should be better balanced and lower inventories would be beneficial to everyone . . . [but] shale producers signaled they weren't ready to give up on the growth they see ahead." They would be ready, though, when the price was right. This opening posture was met with similarly hard-nosed positions from OPEC:  Shortly after the meeting, Saudi Arabia's Energy Minister Khalid Al-Falih publicly warned U.S. shale producers that OPEC would not sustain the U.S. producers' "free rides" on OPEC production cuts.[32] At a meeting between Falih

---

[29]    Wethe, *supra* n.24 (emphasis added).

[30]    Blas, *supra* n.26 (emphasis added).

[31]    *Id.* Information about inventories, capacity and cost structure is also a key element of cartel negotiation, because it establishes what the competitive terrain would look like in the absence of coordinated production cuts, allowing cartel members to allocate production quotas.

[32]    Ron Bousso, *Exclusive - Saudis Tell U.S. Oil: OPEC Won't Extend Cuts to Offset Shale - Sources*, Reuters (Mar. 9, 2017), https://www.reuters.com/article/us-ceraweek-

and producers, including Defendants Occidental, Pioneer, and EOG, "'One of the advisors said that OPEC would not take the hit for the rise in U.S. shale production,' a U.S. executive who was at the meeting told Reuters." Put another way, OPEC told U.S. shale producers that they would not maintain high oil prices if shale producers kept adding production to take advantage of them; U.S. Independents would have to bear their fair share of production cuts. As with many nascent cartels, negotiations were adversarial but ultimately cooperative.

76.    Later that year OPEC Secretary General Barkindo told reporters that Defendants were "beginning to ask questions about how to proceed [alongside OPEC] in a more responsible manner."[33] According to Barkindo, his takeaway from a CERAWeek Conference sideline meeting with executives of Defendants Hess and Continental Resources was that "[t]here is a general understanding that this downturn [caused by the price war] was not in the interest of anybody" and "[a]s much as we felt the pinch so did they."[34] He called for U.S. shale producers to take "shared responsibility" for oil prices.[35]

77.    Next year's CERAWeek Conference was in early March 2018. Discussing another scheduled dinner with U.S. shale producers, Barkindo explained, "[i]t's a fulfillment of our common desire to continue the dialogue as agreed last year on the sidelines of CERAWeek."[36] He said the dinner was arranged to "**further explore the mechanic of achieving our *common objective.***"[37]

78.    The dinner was held at the Grove restaurant, a Houston steakhouse, on March 5, 2018. Secretary General Barkindo gave a speech to the gathered OPEC officials and U.S. shale executives; Tim Dove, then CEO of Defendant Pioneer, later described Barkindo's dinner speech

---

saudishale/exclusive-saudis-tell-u-s-oil-opec-wont-extend-cuts-to-offset-shale-sourcesidUSKBN16G2TJ.

[33]    Anjli Raval, *OPEC Secretary General: 'No Doubt' Oil Market is Re-Balancing*, FIN. TIMES (Oct. 19, 2017), https://www.ft.com/content/89ddcf13-f338-315a-99ba-366256c7266a.

[34]    *Id.*

[35]    *Id.*

[36]    Blas & Smith, *supra* n.30.

[37]    *Id.* (emphasis added).

to a reporter as an exchange of OPEC's forward-looking views on the oil market: "his main message was that [OPEC] believe[s] very strongly that demand is going to be significant moving forward in terms of growth." Mark Papa, Defendant Centennial's CEO, characterized the speech as "a statement that **everyone will work together** to make sure the oil market is well-supplied and everyone is happy to be working together."[38]

79. OPEC representatives revealed that the dinner facilitated another exchange of forward-looking production expectations. Secretary General Barkindo reported that OPEC and the U.S. shale executives "had a very open, frank and lively conversations on the current state of the cycle and **we also compared notes from our experiences during these cycles, how we should proceed going forward**. I was very surprised by the high-level of turnout, as well as the interest they [U.S. shale executives] have shown in continuing this energy dialogue."[39] Per Barkindo, OPEC and Defendants had "**compared notes on our experiences in this cycle [*i.e.*, the recent price war] which everyone agreed was the most injurious.**"[40]

80. Gabriel Mbaga Obiang Lima, Equatorial Guinea's petroleum minister, told the press: "The key thing is that information is shared about our projections; it really helps everybody . . . the important thing is to know how much they [U.S. shale] are investing and their projections because usually they have good statistics."[41] Lima, perhaps unused to the nuances of U.S. antitrust law, tipped the purpose behind this information exchange: "What we are doing is avoiding volatility," he said—or, put differently, stabilizing prices by coordinating production.[42]

---

[38]    Ernest Scheyder and Ron Bousso, *CERAWEEK-U.S. Shale and OPEC Share Steak in Uneasy Truce at Houston Dinner*, REUTERS (Mar. 7, 2018), https://www.reuters.com/article/ceraweek-energy-opec-shale/rpt-%20ceraweek-u-s-shale-andopec-share-steak-in-uneasy-truce-at-houston-dinner-idUKL2N1QP05R.

[39]    *OPEC bulletin Special Edition: OPEC international energy dialogues*, OPEC (May 9, 2018), https://www.opec.org/opec_web/static_files_project/media/downloads/publications/OB022019.pdf, at 51 (emphasis added).

[40]    Patti Domm, *OPEC Wants to Take Its Relationship with US Shale Producers to the Next Level*, CNBC (Mar. 6, 2018), https://www.cnbc.com/2018/03/06/opec-wants-to-take-itsrelationship-with-us-shale-producers-to-the-next-level.html (emphasis added).

[41]    *Id.*

[42]    *Id.*

81.    Continuing the theme of explicit calls for coordination with U.S. shale oil on production levels, Nigerian Oil Minister and OPEC representative Emmanuel Ibe Kachikwu called for U.S. shale to "take some responsibilities in terms of stability of oil prices."[43]

82.    Defendants likewise recognized that the dynamics had started to change, sometimes in even more explicit words. Reuters reported that one shale executive, who spoke on the condition of anonymity crowed that U.S. shale oil companies had maneuvered their successful price-war resistance into **"a seat at the table on pricing."**[44] Even *having* a "table on pricing" is, of course, a violation of the Sherman Act, which forbids price fixing with competitors unequivocally; OPEC may escape U.S. law by virtue of its sovereign sponsorship and international political clout, but U.S. companies most certainly do not enjoy the same luxury.

83.    Following this second round of negotiations, the Independents signaled more flexibility. One reporter noticed, for example, that Defendant Continental's CEO Harold Hamm "appeared . . . to be trying to reach a more conciliatory tone with OPEC producers."[45] In May 2018, Hamm "attended a board meeting of Saudi Aramco, the oil producer controlled by OPEC's largest member, Saudi Arabia," and agreed to speak at an OPEC event, where his appearance was "widely anticipated," not least because of the public shots Hamm had taken at OPEC during the price war.[46] The report concluded by noting that Hamm "has also begun **asking fellow shale producers to focus more on profitability and less on profligate production.**"[47]

84.    With OPEC having come to the U.S. twice to visit shale producers, it was time for

---

[43]    Ernest Sheyder, *Nigeria Prime Minister says majors in shale, OPEC should keep crude price stable*, REUTERS (Mar. 5, 2018), https://www.reuters.com/article/us-ceraweek-energynigeria/nigeria-minister-says-majors-in-shale-opec-should-keep-crude-price-stableidINKBN1GH347.

[44]    Alex Lawler & Ernest Scheyder, *OPEC to Meet with U.S. Shale Firms in Houston on Monday: Sources*, REUTERS (Feb. 27, 2018), https://www.reuters.com/article/us-oil-opecusa/opec-to-meet-with-u-s-shale-firms-in-houston-on-monday-sources-idUSKCN1GB2KP.

[45]    Ernest Scheyder, *Continental Resources CEO Harold Hamm pulls out of OPEC meeting*, REUTERS (June 18, 2018), https://www.reuters.com/article/us-oil-opec-contl-resources-idUSKBN1JE1VW/.

[46]    *Id.* Hamm ultimately pulled out of the appearance, evidently in response to retaliatory Chinese tariffs on U.S. crude.

[47]    *Id.*

the U.S. executives to do some flying. Secretary General Barkindo invited U.S. shale officials to join him at the June 2018 OPEC International Seminar in Vienna.  At least two Defendant executives, Scott Sheffield (Pioneer) and John Hess (Hess) attended the event, during which Sheffield articulated a negotiating position for U.S. shale oil producers, stating that "OPEC should boost daily output by roughly 1 million barrels over time."[48] He also mentioned explicit price targets: "They [OPEC] need to put together some kind of deal to phase into the market. None of us want $80 to $100 [per barrel] oil, that's too high. There's a sweet spot between $60 and $80."[49] Sheffield stressed that, "OPEC needs to fulfill its duty."[50] A reporter archly noted that "Sheffield will not be part of OPEC's production negotiations on Friday, but his comments are likely to play into the group's discussions. . . . That Sheffield even came to the OPEC event surprised some market observers. U.S. antitrust law prohibits U.S. producers from making any output agreement or from working with OPEC members."[51]

85.    This was an odd position for Sheffield to take, unless it is understood to signal movement by U.S. shale producers in their ongoing negotiations over production quotas. The higher the price of oil, of course, the better for U.S. shale producers, who can (in a competitive market) economically reach more oil, and earn more from existing wells, when prices are high enough to support their marginal resource plays. Additional OPEC production does neither Pioneer nor the shale industry any favors, effectively lowering the price of oil and diverting market share to OPEC and away from shale. Absent an unusual generosity of spirit from the shale oil industry, the only reason to articulate such a position on the doorstep of an OPEC production meeting would be to narrow the gap in the Independents' and OPEC's negotiating positions.

86.    Critically, at the 2018 OPEC summit in Austria, Defendants publicly admitted,

---

[48]    Ernest Scheyder, *U.S. Shale Executive Pushes OPEC to Gradually Boost Output*, Reuters (June 20, 2018), https://www.reuters.com/article/oil-opec-pioneer-natl-rsc-idINKBN1JG2OB.

[49]    *Id.*

[50]    *Id.*

[51]    *Id.*

maybe for the first time, to actively participating, rather than merely listening, during their meetings with OPEC. Sheffield admitted to conversing with the OPEC panel about Defendants' and OPEC's volumes, and the effects on global oil prices: "My message yesterday as I spoke to the panel was that it's important that OPEC increases production somewhat to make up for the difference. If they don't we are going to see $100 oil or higher."[52]

87.    The exchange between Sheffield and OPEC appears to have been extremely specific: Two days before OPEC's June 22, 2018 production negotiation, Sheffield predicted to Bloomberg the exact amount of OPEC's production change.[53]

88.    In January 2019 at the Davos World Economic Forum, John Hess, CEO of Defendant Hess, Vicki Hollub, CEO of Defendant Occidental and OPEC's Secretary General Barkindo sat together on a panel with Dan Yergin, Vice Chairman of IHS Markit.[54]

89.    Reuters reported that both Hess and Hollub "said that growth of U.S. shale oil output would slow" in the near future.[55] Barkindo, in turn, expressed a desire "to talk more regularly to U.S. producers to understand their industry better even if they could not participate in any OPEC-led production cuts."[56] In other words, OPEC wanted to coordinate mutual production cuts while winking at U.S. law.

---

[53]    *Compare* Bloomberg Daybreak: Americas, *Pioneer Chairman Sees an OPEC Increase of Up to 600,000 B/D*, BLOOMBERG (June 21, 2018), https://www.bloomberg.com/news/videos/2018-06-21/pioneer-chairman-sees-an-opec-increase-of-up-to-600-000-b-d-video (Sheffield: "The soft number will be around 5-600,000 [bpd], they might announce 1 million . . . and that will phase in over the next few months.") *with* Rania El Gamal, et al., *OPEC agrees modest hike in oil supply after Saudi and Iran compromise*, REUTERS (June 22, 2018), https://www.reuters.com/article/us-oil-opec/opec-agrees-modest-hike-in-oil-supplyafter-saudi-and-iran-compromise-idUSKBN1JI0OG/ ("Saudi Arabia said the move [increase in production] would translate into a nominal output rise of around 1 million barrels per day (bpd), or 1 percent of global supply. Iraq said the real increase would be around 770,000 bpd[.]").

[54]    IHS is a major supplier of data products in the oil market and other financial markets. Yergin is a very well known energy market commentator, particularly on the intersection of energy markets with international political and security considerations. As the founder of Cambridge Energy Research Associates (the CERA in CERAWeek), Yergin is also the chairman of the CERAWeek Conference.

[55]    Dmitry Zhdannikov, *U.S. Oil Firms Tell OPEC Their Growth Will Slow*, REUTERS (Jan. 23, 2019), https://www.reuters.com/article/uk-davos-meeting-opec-usa-idUKKCN1PH1TG.

[56]    *Id.*

90.    Hess winked back, saying "OPEC plays a very important role in stabilising the market and those efforts need to be recognised."[57] Barkindo emphasized that OPEC and Defendants, **" have to continue to collaborate. It is one industry. It is a global industry, and I think our colleagues in the US are on the same page with us and we will work together to exchange views."**[58]

91.    For the third CERAWeek in a row, from March 11-14, 2019, U.S. shale executives and OPEC met with each other at the event. Bloomberg reported that "[t]he event has become an informal communication channel between the cartel and fast-growing shale producers."[59] In the leadup to these meetings, Secretary General Barkindo explained, "[w]e initiated a valuable dialogue with the U.S. shale producers two years ago in the midst of the last cycle and we agreed to continue the dialogue because we broke barriers . . . . It is essential we continue the conversation with U.S. shale industry."[60]

92.    Reporting on a Monday night dinner attended by CEOs John Hess, Vicki Hollub, Mark Papa, and Travis Stice, from Defendants Hess, Occidental, Centennial, and Diamondback, respectively, Barkindo described a "friendly conversation on current industry issues and the immediate prospects and challenges for all." Diamondback CEO Stice also told reporters that OPEC and Defendants had "a very good session,"  consisting of  "open dialogue on some of the things that are going on in the U.S. shale revolution, U.S. oil production and the associated balance of what's going on in our industry."

93.    January 2019 marked the start of renewed production reductions by OPEC and its allies , who all agreed to cut supply by 1.2 million bpd throughout the next six months.

---

[57]    *Id.*

[58]    Tom DiChristopher, *Trump blasted OPEC this past year. Hess CEO says the oil producer group deserves praise*, CNBC (Jan. 23, 2019), https://www.cnbc.com/2019/01/23/trump-blastedopec-hess-ceo-says-the-group-deserves-praise.html.

[59]    Javier Blas and Kevin Crowley, *OPEC to Break Bread With Shale Competitors for Third Year*, BLOOMBERG (Mar. 11, 2019), https://www.bnnbloomberg.ca/opec-to-break-bread-withshale-competitors-for-third-year-1.1227226.

[60]    *Id.*

Following announcements of the cuts, Reuters reported that "U.S. shale producers cheered OPEC's decision to trim output, a move that sent crude prices higher [when announced] closing at levels that [shale] oil executives said would keep their profits flowing." At CERAWeek 2019, Barkindo made clear that OPEC and allies would continue supply adjustments through 2019.

### E.   Defendants' Long Negotiations Culminate in Shale Oil Production Cuts

94.    Yet Defendants' developing cooperative relationship with OPEC, still in its infancy, remained fragile. Though communications and exchanges had ramped up, it is unclear when, exactly, Defendants began coordinating their output in conjunction with OPEC. Through the end of 2018, it at least appeared to the outside world that Defendants were not ready to slow their growth:

Whether this is because OPEC had agreed to allow the U.S. some room for rapid expansion or



Change in crude-oil production since 2014

Source: U.S. Energy Information Administration

the U.S. companies were taking a hard line is not yet known. What is clear is that knowledgeable industry commentators expected the U.S.'s rapid expansion to continue, but it did not.

95.    According to analyst predictions, 2019 would catapult the start of "[t]he second wave of the U.S. Shale revolution." This would have been "concerning for OPEC" because, rather than the calculated supply control that OPEC sought, "U.S. oil output is expected to grow

by 1.4 million barrels a day this year, to average 12.4 million barrels a day."[61]

96.    Analysts' predictions of the second wave never came to fruition. In 2020, COVID-19 upset plans in every industry, but especially oil, where lockdowns drove demand to unheard-of lows. A mix of lockdown chaos and futures market technicalities drove the price of oil *below zero* on April 20, 2020, and remained under $40 per barrel from early March to mid-June. OPEC made emergency cuts to production to stabilize prices; the shale oil industry went through another round of mergers and bankruptcies, further consolidating market share in the hands of large players.

97.    If Defendants and OPEC had not reached full agreement *before* COVID, they soon did *after* COVID. Following months of market turmoil, in July 2020, OPEC's Secretary General indicated that OPEC could inflate and sustain high crude prices, and would do so if Defendants cooperated in turn:

> "We were able to reach out to the U.S. independents and we had established a line of communication with them. **We have reached some level of comfort among ourselves. They have been participating also at their own levels to ensure that this conversation is inclusive and is led by the biggest producers.** There is no objective whatsoever from us as a group or as individual countries to drive U.S. shale production out of business. **Everybody has a role to play. We are very much appreciative of the support and the cooperation we are getting from the U.S. both at the level of policymakers as well as from industry.**"[62]

98.    On November 28, 2020, EOG Resources' CEO Bill Thomas voiced the industry's promise not to increase production in response to OPEC's raising oil prices: "In the future, **certainly we believe OPEC will be the swing producer—really, totally in control of oil prices. . . . We don't want to put OPEC in a situation where they feel threatened, like we're taking market share while they're propping up oil prices.**"[63]

---

[61]    Sarah McFarlane & Pat Minczeski, *OPEC vs. Shale: The Battle for Oil Price Supremacy*, The Wall Street J. (Apr. 18, 2019), https://www.wsj.com/articles/opec-vs-shale-the-battle-foroil-price-supremacy-11555588826.

[62]    *OPEC Secretary General: No objective to drive US shale out of business*, Oil & Gas Journal (July 9, 2020), https://www.ogj.com/general-interest/article/14179258/opec-secretarygeneral-no-objective-to-drive-us-shale-out-of-business.

[63]    Kevin Crowley, et al., *The Pandemic Has Broken Shale and Left Oil Markets in OPEC Hands*, Bloomberg (Nov. 28, 2020), https://www.bloomberg.com/news/articles/2020-11-

99.     In early 2021, as pre-pandemic life began to resume, gasoline and diesel demand surged, and with it, so did crude oil prices, reaching nearly $70 a barrel in March 2021. To push prices up further, OPEC and OPEC+ countries purposefully and collectively withheld production in the face of this rising demand.

100.     Defendants held up their end of the bargain. Abruptly, and in near-unison, they slowed down their own new production. Suddenly, Defendants' CEOs began making a lot of public statements about the need for the industry to exercise "discipline" in its production decisions. Throughout 2021, Defendants signaled to each other and to OPEC that they would ignore market price signals and abdicate their role as swing producers:

   a. In February 2021, Chesapeake CEO Doug Lawler announced that U.S. shale producers were entering a "new era" of shale production that "requires a different mindset" of "more discipline and responsibility."[64]

   b. Pioneer CEO Scott Sheffield predicted that small companies—those not included in discussions with OPEC—would increase output to meet rising prices, but that major producers would not, such that in the aggregate U.S output would "remain flat to 1% higher," even if crude prices exceeded $60, a level at which a market observer noted "any oil production is profitable, especially the relatively high-cost U.S. shale patch."[65]

   c. Then, in March 2021, on the same day OPEC publicized its supply restrictions, Occidental CEO Vicki Hollub said that even in this "healthier supply and demand environment" and despite "a V-shaped" post-pandemic recovery, U.S. oil production would not resume to pre-pandemic heights., Defendants and other U.S. shale producers were now "committed to value

---

28/thepandemic-has-broken-shale-and-left-oil-markets-in-opec-hands.

[64]     Alex Lawler & Jennifer Hiller, *OPEC, U.S. Oil Firms Expect Subdued Shale Rebound Even as Crude Prices Rise*, REUTERS (Feb. 23, 2021),https://www.reuters.com/business/energy/opec-us-oil-firms-expect-subdued-shale-rebound-even-crude-prices-rise-2021-02-22/.

growth, rather than production growth."[66]

d.   In April 2021, Sheffield laid his cards on the table for why his company and other U.S. producers would not meet rising prices: **"OPEC and Russia were upset that we grew too much," said Sheffield. "If we ever start growing again too much, we're going to have another price war."** He stated he was "totally against" an EIA forecast predicting substantial production growth and that **"producers now know the stakes and will stick to their mantra of capital discipline."** [67]

e.   In a June 2021 interview with Reuters, Sheffield said he was **"confident the producers will not respond"** to the high crude oil prices by increasing production, because they were focused on "shareholder returns."[68] Reuters further reported that "[i]n the United States, closely held companies have contributed substantially to rig additions this year, but Sheffield said those smaller firms should not drive up volumes enough to ruffle OPEC+ producers."[69]

f.   On an August 5, 2021 earnings call, EOG President and CEO Bill Thomas, picked up the "new era" terminology first put forward by Chesapeake's Lawler, explicitly connecting U.S. producers' collective discipline with shared prosperity from monopoly rents. He predicted: "I think OPEC+ is solid. **I think the U.S. will remain disciplined. And so, I think the industry is in**

---

[66]    Pippa Stevens, *U.S. Oil Production Won't Return to Pre-Pandemic Levels, Says Occidental CEO*, CNBC (Mar. 4, 2021), https://www.cnbc.com/2021/03/04/us-oil-productionwont-return-to-pre-pandemic-levels-occidental-ceo.html#:~:text=Occidental%20CEO%20Vicki%20Hollub%20said,Evolve%20conversation%20with%20Brian%20Sullivan.

[67]    Kevin Crowley, *Pioneer Chief Warns of OPEC+ Price War Risk*, RIGZONE (Apr. 14. 2021), https://www.rigzone.com/news/wire/pioneer_chief_warns_of_opec_price_war_risk-14-apr-2021-165162-article/.

[68]    Liz Hampton, *U.S. Shale Industry Tempers Output Even as Oil Prices Jump*, REUTERS (June 28, 2021), https://www.reuters.com/business/energy/us-shale-industry-tempers-outputeven-oil-price-jumps-2021-06-28.

[69]    *Id.*

for a long run of really good results."[70]

    g.   On October 3, 2021, Sheffield said U.S. producers were not willing to increase supply to curb soaring crude oil prices that were "under OPEC control,"[71] reflecting Defendants' production restraint agreement. Sheffield reaffirmed Pioneer's commitment to the agreement, promising to cap any Pioneer output increase at 5% per year *regardless of the price of crude oil*, explaining **"everybody's going to be disciplined, regardless whether it's $75 Brent,[72] $80 Brent, or $100 Brent."[73]**

101.    Defendants' "discipline" during this period was a stark departure from their prior behavior. With break-even prices of approximately $40/barrel, withholding production was not a logical response, nor seemingly in their best interest. Reporters and industry analysts found it remarkable, if not bizarre:

    a.   In January 2021, Reuters reported that "U.S. shale producers are keeping their pledges to hold the line on spending and keep output flat, a departure from previous boom cycles."[74] The reporter noted that 2021's "run up in crude prices, and **oil output curbs imposed by the OPEC+ producers group, historically would have triggered a drilling boom.**"[75]

---

[70]    EOG Resources (EOG), *Q2 2021 Earnings Call Tr.,* THE MOTLEY FOOL (Aug. 5, 2021), https://www.fool.com/earnings/call-transcripts/2021/08/05/eog-resources-eog-q2-2021-earnings-call-transcript/.

[71]    Derek Brower & David Sheppard, *US Shale Drillers Cannot Contain Oil Price Rise, Pioneer Boss Says*, FIN. TIMES (Oct. 3, 2021), https://www.ft.com/content/c21eb656-8d09-45cea13a-7d8419426b05.

[72]    "Brent" refers to Brent crude, a widely recognized benchmark for pricing crude oil internationally. The price of Brent crude oil is determined through trading on the Intercontinental Exchange ("ICE") in London. It is often used as a reference point for setting oil prices.

[73]    Brower & Sheppard, *supra* n.87. "Brent" refers to the price of Brent standard sweet light crude oil, a standard originally based in crude extracted from Brent oilfield in the North Sea. The other commonly used crude oil price in the U.S. is the "WTI" (West Texas Intermediate) oil standard. The two standards and prices differ slightly but are not relevant to these allegations.

[74]    Liz Hampton, *U.S. Shale Industry Tempers Output Even as Oil Prices Jump*, REUTERS (Jan. 28, 2021), https://www.reuters.com/business/energy/us-shale-industry-tempers-outputeven-oil-price-jumps-2021-06-28.

[75]    *Id.*

b.  In June 2021, a second Reuters journalist observed that "U.S. shale producers have normally captured market share from OPEC+ whenever prices have been above $55-60 per barrel."[76] However, Defendants' output restraints had **"emboldened OPEC+ to maintain its own output curbs, temporarily removing the threat of lost market share and accelerating the upward pressure on prices. Shale producers have publicly reiterated their new commitment to output restraint in interviews as well as calls with analysts and investors."**[77]

c.  On an earnings call for Chesapeake in early 2022, Bank of America Managing Director and Head of U.S. Oil and Gas confronted  Chesapeake's CEO over their plans to slow production, admonishing that it would be "the easiest way to destroy value" for the company in the long term.[78]

102.    Yet OPEC was not surprised. In early 2021, OPEC predicted a significant annual drop in U.S. shale production.[79] OPEC also signaled that the price war was over. Secretary General Barkindo reported that "U.S. shale is an important stakeholder in our global efforts to restore balance to the oil market" and that Independents and OPEC "**have a shared responsibility in this regard.**"[80]

**F.    Defendants' Coordination with OPEC Reaches New Heights in 2022-2023**

103.    In 2022, reacting to Russia's invasion of Ukraine, crude oil prices shot up. Distinct from the drastic drop in demand precipitated by the pandemic , this was a supply-side shock that caused a decrease in the quantity of oil available in the U.S. market, both from

---

[76]    John Kemp, *U.S. Shale Restraint Pushes Oil Prices to Multi-Year High*, REUTERS (June 4, 2021), https://www.reuters.com/article/global-oil-kemp-idAFL5N2NM37M.

[77]    *Id.*

[78]    Chesapeake Energy Corporation (CHK), *CEO Nick Dell'Osso on Q4 2021 Results - Earnings Call Transcript*, SEEKING ALPHA (Feb. 24, 2022), https://seekingalpha.com/article/4489980-chesapeake-energy-corporation-chk-ceo-nickdellosso-on-q4-2021-results-earnings-call.

[79]    Lawler & Hiller, *supra* n.80.

[80]    *Id.*

increased strain on supply chains, and more importantly, the separation of Russia's oil

production from the world market.

104. By mid-2022, the price of oil surpassed $120 a barrel—its highest price since the

overheated pre-crash economy of 2008. Aiming to maintain these high prices as the initial price

shock from Russia's invasion wore off, OPEC withheld further production, and made production

cuts in October 2022 of two million barrels per day. OPEC announced these cuts as crude prices

began to return to normalcy from their near-record highs, and indicated they were intended to

"stabilize the recent fall in global energy prices."[81]

105. The year 2022 saw record high prices that remained highthroughout 2023. Yet

Defendants continued to act against their rational economic self-interest and withheld

production. :[82]

a. In February of 2022, against the backdrop of Russian's imminent invasion of

Ukraine, Sheffield once more made remarks alluding to the existence of an

agreement between and among Defendants: "In regard to the industry, it's

**been interesting watching some of the announcements so far, the public[ly**

**listed] [I]ndependents are** *staying in line*" and **"I'm confident they will**

**continue to stay in line."**[83] Shockingly, he disclaimed *any* sensitivity to the

price of oil even if it nearly *doubled*, sending untold shale acreage into

unheard of profitability. **"Whether it's $150 oil, $200 oil, or $100 oil, we're**

---

[81]    Jeff Stein, et al., *OPEC, Allies Move to Slash Oil Production, Eliciting Blistering White House Response*, THE WASH. POST (Oct. 5, 2022), https://www.washingtonpost.com/business/2022/10/05/opec-plus-oil-cut-russia-saudi-arabia/.

[82]    *See* Lawler & Scheyder, *supra* n.51; Erik Norland, *As Oil Prices Plunge, What Will Swing Producers Do?*, CME GROUP (Nov. 21, 2018), https://www.cmegroup.com/education/featured- reports/as-oil-prices-plunge-what-will-swing-producers-do.html (in the past, "higher [crude oil] prices incentivized an enormous increase in U.S. production", and even OPEC members understood that "[i]t's normal for shale oil, tight oil [production] to increase . . . whenever oil prices support it.").

[83]    Tsvetana Paraskova, *Not Even $200 Oil Will Make Shale Giants Drill Aggressively*, OILPRICE.COM (Feb. 18, 2022), https://oilprice.com/Energy/Energy-General/Not-Even-200-Oil-Will-Make-Shale-Giants-Drill-Aggressively.html#:~:text=The%20largest%20U.S.%20shale%20producers,shale%20firms%20said%20this%20week.

1      **not going to change our growth plans,.**" he told one reporter.[84]

2     b.  Later in February, other Defendants signaled their alignment. During an

3        earnings call, Continental CEO William Berry confirmed, "[w]e project

4        generating flat to 5% annual production growth over the next five years."[85]

5     c.  On February 22, 2023, Diamondback CEO Travis Stice asserted, "we have no

6        reason to put growth before returns . . . we will continue to be disciplined."[86]

7     d.  On February 24, 2022, Bloomberg reported that "EOG Resources Inc. plans to

8        restrain oil growth despite surging prices, falling into line with most other

9        major U.S. independent shale producers. . . . like Pioneer Natural Resources

10       and  Continental Resources[, who] are also limiting increases to less than 5%

11       this year."[87]

12     e.  In March 2022, Occidental CEO Vicki Hollub touted  its "huge inventory of

13        high-quality investments" but bizarrely explained her company's failure to act

14        on those opportunities to expand production by alternately blaming the

15        pandemic and explaining the decision as a "focus[] on returning capital to

16       shareholders."[88]

17     f.  On an August 2022 earnings call, EOG said that even though the economic

18        conditions were ripe for a production increase, the company intended to limit

19        its 2023 production growth to "low single digits" and  was "committed to

---

[84]   *Id.*

[85]   *Id.*

[86]     Geert De Lombaerde, *Diamondback to Keep Production Flat, Invest $1.75 Billion in 2022*, OIL & GAS J. (Feb. 23, 2022), https://www.ogj.com/drilling-production/article/14234465/diamondback-to-keep-production-flat-invest-175b-in-22.

[87]     Kevin Crowley, *EOG Holds Back Oil-Production Growth in Line with Shale Peers*, BLOOMBERG (Feb. 24, 2022), https://www.bloomberg.com/news/articles/2022-02-24/eog-holdsback-oil-production-growth-in-line-with-shale-peers.

[88]     Pippa Stevens, *Oil Producers in a 'Dire Situation' and Unable to Ramp Up Output, Says Oxy CEO*, CNBC (Mar. 8, 2022), https://www.cnbc.com/2022/03/08/oil-producers-in-a-dire-situation-and-unable-to-ramp-output-says-oxy-ceo.html.

remaining disciplined."[89] In 2022, EOG increased production by a mere 4% and indicated it planned for the same increase in 2023.[90]

g. In January 2023, Sheffield stated that the "aggressive growth era of US shale is over." According to Sheffield, Pioneer and the other Defendants were "no longer a swing producer."[91]

106. Against this backdrop of high crude prices and increasing efficiency, oil industry observers expressed their continued shock at Defendants' production restraint and refusal to compete for market share:

a. An article in the Washington Post, posited that the price increases following Russia's invasion of Ukraine were a "clear signal to raise [shale] production; we're talking Bat- Signal clarity here."[92]

b. A February 2022 Bloomberg article questioned why Defendant EOG wouldn't "take advantage of higher prices by pumping more crude from its shale fields." The article noted that EOG "plan[ned] to restrain oil growth this year despite surging prices, falling into line with most other major U.S. independent shale producers."[93]

c. In March 2022, a CNBC anchor observed: "I know we keep hearing about this key code word from all of the oil companies right now that they are 'disciplined,' but when you see oil at north of 120 dollars a barrel, I mean it's

---

[89]    EOG Resources (EOG), *Q2 2022 Earnings Call Tr.,* THE MOTLEY FOOL (Aug. 5, 2022), https://www.fool.com/earnings/call-transcripts/2022/08/05/eog-resources-eog-q2-2022-earnings-call-transcript/.

[90]    Liz Hampton, *U.S. Shale Producer EOG Sticks to 4% Annual Output Growth*, REUTERS (Aug. 5, 2022), https://www.reuters.com/business/energy/us-shale-producer-eog-maintain-lowsingle-digit-oil-output-2022-08-05/.

[91]    Derek Brower and Myles McCormick, *What the End of the US Shale Revolution Would Mean for the World*, FIN. TIMES (Jan. 15, 2023), https://www.ft.com/content/60747b3b-e6ea-47c0-938d-af515816d0f1.

[92]    Denning, *supra* n.14.

[93]    Crowley, *supra* n.105.

one thing to be disciplined, it's another thing to miss an opportunity."[94]

    d.   On April 3, 2023, following additional reductions by OPEC, Bloomberg reported that the U.S. shale industry did not plan to "break a three-year trend" by increasing production in response to rising oil prices, and would not "rescue" U.S. consumers from high gas prices, despite being "flush with cash after record profits."[95] As one industry expert explained, "OPEC and shale are much more on the same team now, with supply discipline on both sides" which "really puts a floor under the price of oil long term."[96]

107.    Over the course of 2022 and 2023, Defendants and OPEC officials continued to meet and communicate with each other.

108.    At the 2022 CERAWeek Conference, held in Houston, Texas, between March 6-10, Defendants met with OPEC officials once more. At some point during the 2022 conference week, Defendants and OPEC "gathered in a private room at a restaurant and U.S. producers presented OPEC Secretary General Barkindo with a bottle labeled 'Genuine Barnett Shale' – from the oilfield that launched the shale revolution. Barkindo proudly displayed the memento as he left the meeting, which included executives from Hess Corp . . . and Chesapeake Energy."[97] As observed by Reuters, Defendants and OPEC had "found themselves on similar sides as oil prices have surged well above $100 a barrel: in no rush to rapidly boost production."[98] Chesapeake CEO Domenic Dell'Osso agreed that "[w]ere shale to ramp up output only to have prices fall, we have destroyed a lot of value for shareholders and haven't helped the problem."[99]

109.    In March, 2023, "about two dozen [U.S. shale executives] including [Defendants'

---

[94]    Stevens, *supra* n.106.

[95]    Kevin Crowley and Mitchell Ferman, *Don't Expect US Shale to Quickly Fill the Gap Left by OPEC+ Cut*, BLOOMBERG (Apr. 3, 2023), https://www.bloomberg.com/news/articles/2023-04-03/opec-surprise-cut-won-t-be-filled-by-us-shale-oil?in_source=embedded-checkout-banner.

[96]    *Id.*

[97]    Hampton, *supra* n.29.

[98]    *Id.*

[99]    *Id.*

1  executives:] Sheffield [of Pioneer], . . . Nick Dell'Osso of Chesapeake Energy, Travis Stice of

2  Diamondback Energy, Vicki Hollub of Occidental Petroleum, and John Hess of Hess

3  Corporation met with OPEC Secretary General[-elect] Haitham Al Ghais[100] for a private dinner

4  in a downtown Houston steakhouse" to reaffirm their mutual commitment to withholding

5  production, "[d]espite recent record profits." At the dinner, **"[t]he shale executives pressed Al**

6  **Ghais on how much spare production capacity OPEC could deploy, and offered their own**

7  **assessment of how much extra output the US could deliver this year – a range between**

8  **400,000 and 600,000 b/d, according to one person at the dinner."** While speaking to the

9  reporter, Sheffield stood fast in his support of OPEC, "I think the people that are in charge now

10  are three countries – and they'll be in charge the next 25 years. Saudi first, UAE second, Kuwait

11  third." Sheffield appears not to have commented on his industry's collective proposal of forward-

12  looking production estimates to OPEC, or what they received in return.

13      110.    At the start of 2023, Defendants made it even more clear that they were

14  coordinating with OPEC, making financial decisions they could not reasonably have made

15  without advance knowledge of OPEC production cuts.

16      111.    On January 5, 2023, Defendant Pioneer's CEO Sheffield claimed that "OPEC

17  ministers are frustrated over the recent price fall," before predicting that upcoming production

18  was "going to change . . . . If [price] stays too low, it wouldn't surprise me if [OPEC] ha[s]

19  another cut . . . . [W]e'll see what happens in the next 90 days."

20      112.    Then, 87 days later, OPEC "shocked traders around the world" by declaring a

21  "surprise" production cut as OPEC "had been largely expected to stick to its already agreed 2m

22  bpd cuts."

23

24  ---

[100]    In January 2022, OPEC declined to grant Mohammad Sanusi Barkindo a third term as
25  Secretary General and chose Haitham Al-Ghais, a veteran oil official from Kuwait, as his
    successor. Barkindo was scheduled to leave his position at the end of July 2022, but on July 5, he
26  passed away. According to the New York Times, "[t]here is no indication that the change of
    leadership will influence how much oil OPEC produces." Stanley Reed, *Mohammad Barkindo,*
27  *OPEC's top official, dies*, THE N.Y. TIMES (July 6, 2022),
    https://www.nytimes.com/2022/07/06/business/opec-
28  barkindo.html#:~:text=Barkindo%20was%20scheduled%20to%20leave,how%20much%20oil%
    20OPEC%20produces.

113.    On March 27, 2023, in between Sheffield's prediction and OPEC's shocking announcement, it was brought to the public's attention that some Defendants, including at least Pioneer (Sheffield's company) and EOG, had pulled back the hedge positions they had previously established to protect against downward oil price movements. As a result, Defendants were "suddenly vulnerable" and left exposed to exorbitant economic risk if oil prices declined.

114.    Defendant Pioneer's CEO Sheffield defended its incredibly risky actions, stating "we're not going to hedge," and he remained "optimistic that we'll see $100 a barrel before the end of the year."

115.    On April 2, 2023, within a week of the news concerning Defendants' exposed positions coming to the public forefront, OPEC announced their "surprise" production reduction, cutting a consequential quantity of 1.15 million barrels of oil production per day. There is simply no explanation for Defendants' failure to hedge other than their advance knowledge of OPEC's plan to cut production.

116.    In April 2023, an energy analyst explained the resulting impact from Defendants' output constraint agreement:

> In its early days, shale behaved like a dimmer, with output growth accelerating proportionally as oil prices were dialed up. That ability to respond quickly to the market was due to the speed at which shale wells could be developed: a few months compared to the years or decades of Big Oil projects. Today, shale is as responsive as in the past. But there's a difference. ***The dimmer appears to be capped at a certain level: No matter how high oil prices go above that level – say $100 a barrel – the industry will no longer add rigs to sop up market share***. Rather, it will stay put and go into harvest mode with existing wells – that's exactly what happened in 2022, much to the consternation of the White House, which urged shale companies to drill more.

117.    Defendants were capable of increasing production and gaining market share – that they did not do so was entirely their choice:

| Defendant | 2017-2019 U.S. Oil Production Growth Rate (Comparison Period) | 2021-2023 U.S. Oil Production Growth Rate (Class Period) |
| --- | --- | --- |
| Centennial/Permian | 123% | 56% |
| Chesapeake | 31% | -63% |
| Continental | 43% | 42% |
| Diamondback | 220% | 19% |
| EOG | 36% | 6% |
| Hess | 25% | -6% |
| Occidental | 89% | 8% |
| Pioneer | 34% | 3% |
| Defendants' Production Weighted Average | 63% | 14% |
| Average Crude Oil Price per Barrel | $55.01 | $78.42 |
| Average U.S. Consumer Gasoline Price | $2.67 | $3.61 |

118.    Defendants' agreement to restrain production has achieved its intended effect. Defendants have enjoyed massive revenue increases, which they have retained rather than reinvested into new production.

**G.    Absent Collusion,  Defendants' "Restraint" Is Economically Irrational**

119.    Defendants employed a variety of terms and phrases, including being "disciplined," or focusing on "value growth," or "staying in line," or operating for "shareholder returns," as code for their mutual agreement to coordinate and restrain domestic shale oil production. Moreover, Defendants' repeated public touting of their production discipline revealed that they each had additional production capacity that they simply chose to leave untouched.

120.    In a competitive market, when prices are higher than a firm's marginal costs, the firm increases their supply to the point where the market price equals the marginal cost of producing an additional unit of supply (accounting for an economic profit). Real-world

considerations complicate this model somewhat, but it remains among the foundational principles of microeconomics because those complications *don't matter that much* in the real world. With oil prices far above each Defendant's "break-even" point, each Defendant had enormous incentives to pursue additional production. In a competitive market, firms that decline profitable opportunities lose them to competitors. The oil price war in which the Defendants had just participated illustrated this principle: OPEC, a low-cost oil producer, artificially constrained supply to increase prices; oil shale producers stepped into those prices, made their own substantial profits, and captured substantial market share. OPEC had opened competition to regain that market share, and prices had fallen, but the Defendant shale producers had developed lean and efficient businesses and survived; faced with an opportunity to put its expertise to use in a much more favorable market, each Defendant demurred, resisting the compelling force of the market's invisible hand.

121.    The only economically rational reason any Defendant would choose this path is if they each knew the others would *also* decline to increase production, and that enough of the crude oil market would exercise similar restraint that it would not significantly affect the Defendants' market share. Individually, no U.S. shale oil producer had market power sufficient to constrain overall U.S. shale oil outputs significantly—nevermind world outputs. Together, however, they had substantial power in the U.S. market—especially with respect to the swing production that mattered most to global prices. Together, the Defendants could substantially constrain the portion of U.S. oil production most important to the global price of oil; and as a result, they could exercise their power to negotiate cartel supply restrictions with OPEC, insuring against competition from other major swing producers.

122.    Indeed, the supermajors and many smaller independent producers did respond to these individual incentives, though practical limitations on their ability to respond quickly limited their effect. Supermajors have historically refrained from substantial investments in fracking wells, viewing them as a smaller-scale enterprise difficult to integrate into their very large-scale institutions. Yet in 2021 and 2022, directly responding to U.S. shale producers' "underinvesting as an industry," the supermajors began investing in shale at unprecedented rates.

a. Responding to record high crude oil prices, ExxonMobil planned to boost its 2022 production level in the Permian Basin by 25%.

b. Likewise, Chevron planned  a 10% increase in the same region at the same time.

c. In May 2023, ExxonMobil Chief Executive Darren Woods stated that by using new technologies Exxon aimed to double the volume of oil produced from its U.S. shale holdings over a five-year timeframe.

123.    Smaller companies likewise took advantage of the favorable economic conditions and drilled furiously. In 2022, "[s]maller, privately held firms . . . raised production in response to higher prices and are going full steam ahead."[101] Benefitting from the production gap left by Defendants, these smaller private producers "lead output gains during the highest [crude oil] prices in seven years."[102] As one example, according to Reuters, "Tall City Exploration, a privately-backed Permian [basin] producer, added a second drilling rig . . . and is eying a three-fold increase" from 2021 in 2022 production.[103]

124.    Small shale oil producers, however, are limited in how *fast* they can add supply because they lack Defendants' economies of scale. They have less capital, less access to limiting resources like drilling rigs, and are less able to scale up hiring and management to operate multiple drilling projects in parallel.

**V.    DEFENDANTS COLLECTIVELY AND WITH OPEC EXERCISE SUBSTANTIAL MARKET POWER OVER OIL PRICES**

---

[101]    Liz Hampton, *U.S. Shale Oil Forecasts Keep Rising as Smaller Producers Lead the Way*, Reuters (Mar. 2, 2022), https://www.reuters.com/business/energy/us-shale-oil-forecasts-keeprising- smaller-producers-lead-way-2022-03-02/.

[102]    *Id.*

[103]    *Id.*

125.     That Defendants collectively had sufficient power to dramatically affect global oil prices is unmistakable. The below chart shows quarterly changes in world oil supply and demand from 2005 to 2023.



126.     Much of the world's oil consumption is essentially steady, with substantial changes in demand over time driven by long-term trends. For example, despite variances from quarter to quarter, the above graph shows an overall steady long term upward trend in oil consumption since 2005, driven largely by growth in developing countries and softened somewhat by developed nations' efforts to decarbonize their economies.

127.     Predictable long-term demand trends drive predictable long-term trends in supply, with long-term increasing demand sparking major capital investments in large conventional and unconventional oil projects, usually helmed by supermajors. Sponsors of these large projects invest an enormous amount of up-front capital in developing them on the strength of their long-term predictions of demand, betting that the projects will produce oil at low marginal costs for many years, which oil can be sold into the market at a consistent profit, gradually delivering strong returns on up-front capital.

128.     Because they take so long to plan and bring on-line, these large projects do not affect global prices much, at least on medium-term time horizons, though they do affect the long-

term global mix of suppliers. Supermajors effectively sell their product at consistent and predictable levels to a consistent and predictable base of demand.

129.    On shorter time horizons, supply and demand for oil vary substantially, but within a very narrow band of the total oil market. These variations are represented by the smaller peaks and troughs along the overall upward trend in the chart above. The largest variances in demand during the period shown above are the unprecedented COVID-19 drops in Q1 and Q2 2020, with demand plummeting 7.48 and 6.89 Mmbd, respectively, from pre-Covid demand of about 102 Mmbd. At the lowest ebb of this crisis, in other words, world oil demand declined by a little less than 15%. The next quarter, demand rebounded by 5.63 Mmbd. Excepting the COVID crisis, the largest change in demand in the last 18 years was a decline of 1.95 Mmbd in the second quarter of 2005. On average over this period, even including the volatility induced by the pandemic, global oil demand varied only a bit more that 1 Mmbd from quarter to quarter—an average of about 1.2% throughout the timeline.

130.    World crude oil production varies within a similarly narrow band. The largest quarterly increase in global production was in Q2 2020, jumping 8.38 Mmbd. Average supply changes from quarter to quarter were only 0.82 Mmbd.

131.    These relatively small changes in supply and demand (and the financial markets' expectations about them) drive short- and medium-term variation in the global price of oil. For example, in the second half of 2014, the beginning of OPEC's price war with U.S. Independents, global oil supply increased over Q2 levels by only 3.03 Mmbd. Over the same period, global demand *increased* by 1.53 Mmbd. The resulting 1.5 Mmbd change in the balance of supply and demand—about 2% of total production—sent crude oil prices plummeting from $105.79/bbl in June 2014 to $59.29 in December. **In other words, a two percent net change in oil supply caused a forty-seven percent drop in the price**.

132.    As of 2022, Defendants collectively produced in excess of 1 Mmbd of crude oil, *at artificially constrained conspiracy levels*. This represents a small portion of global oil supply, but it is agile supply at the margin of the oil market's balance of supply and demand. They control even more potential production that could be brought into production within months. As

a result, Defendants' share of short-run productive capacity—the capacity that most affects short-term variation in oil prices—is much higher, particularly when the productive capacity controlled by the OPEC+ cartel is excluded. By withholding their production as a group (and especially by coordinating production levels with OPEC+), Defendants' market power is more than enough to substantially influence global crude prices.

133.    When Defendants' production and productive capacity are considered in conjunction with OPEC and OPEC+, the cartel formed by these entities collectively controls approximately 60% of total world oil production. More importantly, they control nearly all world oil production that can be quickly brought to market in response to short-run price variations.

## VI.    PLUS FACTORS FURTHER SUPPORT THE EXISTENCE OF THE ALLEGED CONSPIRACY

134.    OPEC's and Defendants' statements quoted above amply evince explicit coordination of production cuts among Defendants and OPEC. Lest this evidence be ignored, however, Defendants' parallel conduct in jointly restricting shale oil production is amply supported by "plus factor" indicators that support a plausible and reasonable inference of collusion over potential non-collusive explanations.

135.    The oil industry is highly vulnerable to collusion over production levels. Indeed, it should be undisputed that it supports a thriving cartel that effectively controls global prices. It is the quintessential commodity, where product is interchangeable, facilitating price-fixing negotiations among would-be competitors.

136.    Defendants many opportunities for collusion. As described above, Defendants did in fact meet collectively with OPEC during trade association gatherings, including annually at the CERAWeek Conference in Houston, TX, to discuss their internal cooperation and the overall cooperation with OPEC by all Defendants to maintain that surplus capacity. Public reports of these meetings from participants (who have incentives not to reveal the full extent of their collusion) confirmed that the meetings were explicitly intended to facilitate cooperation between Defendants and OPEC.

137.    The price-moving portion of the oil market—the short-run productive capacity to supply production quickly in response to price signals—is highly concentrated, and most of it is explicitly cartelized in OPEC and OPEC+. Outside of this cartel, Defendants control a significant portion of the remaining productive capacity. More broadly, though the global oil market is relatively diverse, more than 60% of the market is explicitly cartelized.

138.    The market conditions for crude oil sold in the U.S. are susceptible to the price effects of collusion because it, and the downstream products for which it is the key input, is a daily-use commodity that has no substitute for many purchasers and high switching costs for the remainder, leading to highly inelastic demand.[104] Inelastic demand allows producer cartels to extract monopoly rents from customers who have few options to avoid price increases.

139.    As explained in detail above, Defendants faced strong individual incentives to *increase* their production during the class period, and their individual decisions not to increase production are economically rational only if made in a context of mutual commitments among themselves to constrain production.

140.    As illustrated above, Defendants shared a high level of interfirm communications, both in private and through publicly reported statements about competitively sensitive information such as forward-looking production plans.

## VII.    ANTITRUST INJURY

### A.    Defendants' Agreement to Constrain Shale Oil Production Has Influenced the Price of Crude Oil Throughout the Class Period

141.    As noted above in Section V, Defendants' control over a substantial share of short-run productive capacity allows it substantial influence over crude oil prices. Many observers have attributed shifts in the price of oil to U.S. oil shale production.

a.    A 2019 Forbes article, reports that "without the U.S. shale oil boom, [crude] oil prices would have never dropped back below $100/bbl" because, since 2008,

---

[104]    Gasoline itself has highly inelastic demand, meaning that very few consumers will switch to alternative products as the price at the pump rises. This reinforces the inelasticity of upstream demand for crude oil.

"U.S. oil production increased by 8.5 million bpd – equal to 73.2% of the global increase in production."

b.  In a 2017 article titled "The oil market in the age of shale oil," economists declared that, since 2014, US shale oil has impacted the price of oil by amplifying the worldwide crude oil supply and influencing OPEC policies.

c.  In October 2019, the Executive Office of the U.S. President's Council of Economic Advisors asserted that the U.S. shale revolution has "reduced the global price of oil by 10 percent" since 2007.

d.  In 2020, economists from the Federal Reserve Bank of Dallas concluded that oil prices would have risen by 36% in 2018 without the shale oil revolution..

e.  In 2023, an article published in the International Journal of Energy Economics and Policy states that, in the past, "[t]he increase in US crude oil production, driven by shale oil . . . significantly increased oil supply, directly affecting the price of crude oil . . . ."

142.  Defendants admit that they have this influence, yet are choosing not to use it. A New York Times article published on March 2, 2022, reported that, "[e]xecutives of several companies, including [Defendant] Pioneer Natural Resources . . . and [Defendant] Continental Resources, have said in recent days that they were committed to limiting production to avoid oversupplying the market and pushing down prices . . . ."

143.  From no later than 2021, Defendants have collectively coordinated their production decisions, resulting in production growth rates lower than would be seen in a competitive market, despite high oil prices and an active global demand.

144.  Despite production increases from supermajors and smaller private producers, Defendants' production restraint has  significantly impacted total U.S. shale production. In 2022, U.S. shale oil production increased by a mere 500,000 barrels, which was 50% short of market analysts' general yearly predictions.

145.  This result led to a significant difference between the oil supply that *actually* came to market and the oil supply that *would have* come to market absent Defendants'

conspiracy. This gap led to a rise in crude oil prices over the prices that would have prevailed in the "but-for" world, leading invariably to higher prices at the pump for class members and others.

**B.      Defendants' Agreement to Constrain Shale Oil Production Has Inflated the Price of Retail Gasoline and Retail Diesel Fuel Purchased by Plaintiffs and the Classes**

146.     Gasoline and diesel fuel commercial purchasers in the U.S., like Plaintiff and the proposed class members, purchase gasoline and diesel fuel from gas stations and truck stops. Approximately 54-57% of the U.S. price of gasoline is comprised of the price of crude oil used in the manufacturing process, with other cost components covering refining, taxes, and

distribution and marketing.[105] For diesel fuel, crude oil represents approximately 45% of the price at the pump.





147.    Costs of refining, taxes, and distribution and marketing do not fluctuate often, whereas the price of crude oil is actively traded in financial markets and moves constantly, often experiencing large swings. Between March and August 2022, for example, the WTI spot crude oil price ranged from less than $50 per barrel to more than $120. On a *single day* in the class

---

[105]    *The Four Main Factors that Influence U.S. Gas Prices*, U.S. DEP'T OF ENERGY (last accessed Jan. 12, 2024), https://www.energy.gov/sites/default/files/2023-04/GasPriceFactors2.jpg. The remainder of gasoline prices are driven by distribution and marketing costs (16%), refining costs (14%) and taxes (16%).

period—March 9, 2022—the price of oil dropped nearly $15 per barrel, more than 11%. Consequently, as recognized by the U.S. Energy Information Administration, "[r]etail gasoline prices are mainly affected by crude oil prices . . . ."[106] The same is true of diesel.

148.    Defendants' own trade association, the American Petroleum Institute, has acknowledged that "the price of crude oil is the primary determinant of the price we pay at the pump" and that "[n]ationwide on a quarterly basis, crude oil prices have explained more than 90% of the variation in [U.S.] gasoline prices since 2020."[107]



149.    When taking account of crude oil's movement through the supply chain from Defendants to consumers, it is far from surprising that crude oil largely drives the pricing of gasoline and diesel. Defendants and other crude oil producers sell crude oil to refineries, who then use chemical separation and reaction processes to convert crude oil into gasoline, diesel, and other products (*e.g.*, home heating oil, jet fuel, and manufacturing feedstocks). The refineries

---

[106]    EIA, Gasoline Explained: *Factors Affecting Gasoline Prices* (Feb. 22, 2023), https://www.eia.gov/energyexplained/gasoline/factors-affecting-gasoline-prices.php.

[107]    *Gas Prices Explained: Five Fast Facts About U.S. Gasoline Prices*, AM. PETROLEUM INST., (last accessed Jan. 12, 2024), https://www.api.org/oil-and-natural-gas/energy-primers/gasprices-explained#:~:text=The%20primary%20factors%20impacting%20gasoline,gasoline%20retailers%20pay%20to%20distributors.*Id. See also Factors that impact gas prices*, NACS (Apr. 05, 2023) https://www.convenience.org/Topics/Fuels/The-Price-Per-Gallon ("Retail gasoline prices move an estimated 2.4 cents per gallon for every $1 change in the price per barrel [of crude oil].").

then transport the gasoline to bulk terminal storage facilities. Because crude oil is the primary raw material used to refine gasoline and diesel sold in the United States, Defendants' conspiracy had a direct effect on Plaintiffs and members of the Classes who were forced to purchase gasoline or diesel at artificially inflated levels. Gas stations and truck stops purchase gasoline and diesel wholesale from refiners (or other gasoline marketers who have purchased from the refineries) at a price that is directly linked to the price that was paid by refineries for crude oil, including crude oil sold to those refineries by Defendants. Gas stations and truck stops set the price of retail gasoline and diesel above the wholesale price they pay, thereby passing on to Plaintiffs and the class any increase in the wholesale price. Indeed, the National Association of Convenience Stores, a body which represents American gas stations, has confirmed that gas stations mark up the price they pay for gasoline by 35 cents a gallon on average when setting the price at the pump. Figure 12 below, which shows that U.S. gas prices follow the prices paid by U.S. refineries for crude oil, illustrates this dynamic.

**Figure 12. Refiners Crude Oil Acquisition Costs vs U.S. Average Gasoline Prices (Adjusted for Inflation)**



150.    As such, the price of crude oil has a direct effect on the price of retail gasoline.[108] Because crude oil is the primary raw material used to refine gasoline and diesel sold in the United States, and because changes in crude oil prices drove changes in gasoline and diesel prices paid by Plaintiffs and members of the Class throughout the relevant period, Defendants' conspiracy had a direct effect on Plaintiffs and class members who were forced to purchase gasoline or diesel at artificially inflated levels. Indeed, end user consumers and the commercial purchasers, who are class members here, bear much of the brunt of these artificially inflated gasoline and diesel prices. The impact is substantial: nearly all analysts agree that, as an empirical matter, the pass-through rates of shock oil prices to spot gasoline prices are close to 100%.[109] And this impact is quickly felt by purchasers: on average, 60% of a change in bulk spot prices pass-through to the retail price in two weeks, 80% in four weeks, and 100% in just seven weeks.[110] Diesel, too, sustains comparably high pass-through rates.

---

[108]    Ian Thomas, *U.S. won't reach a new record in oil production 'ever again,' says Pioneer Natural Resources CEO*, CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wontreach-new-record-oil-production-ever-again-pioneer-ceo.html (In his 2023 State of the Union, President Biden said that U.S. gasoline prices were too high because oil producers invested "too little" of their "record profits" to ramp up domestic production and "used those record profits to buy back their own stock, rewarding their CEOs.").

[109]    FTC Bureau of Economics, *Gasoline Price Changes and the Petroleum Industry: An Update*, (2011) at 35, https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-bureau-economics-gasoline-price-changes-and-petroleum-industry-update/federal-trade-commission-bureau-economics-gasoline-price-changes-and-petroleum-industry.pdf. See Bumpass et al., *Retail and wholesale gasoline price adjustments in response to oil price changes*, Energy Economics (2015) at 54, https://doi.org/10.1016/j.eneco.2015.08.030 (finding, from study using monthly U.S. city average pricing data, that "in the long run, a one-dollar increase in the price of oil per gallon increases the retail gasoline price by $1.05 per gallon[.]"); Najmeh Kamyabi and Benaissa Chidmi, *Asymmetric Price Transmission between Crude Oil and the US Gasoline Market*, Journal of Risk and Financial Management (2023) at 6, https://www.mdpi.com/1911-8074/16/7/326 (finding, on the state level, comparable pass-through rates of crude oil prices to regular gasoline prices). See also Kangni Kpodar and Chadi Abdallah, "Dynamic Fuel Price Pass-Through: Evidence from a New Global Retail Fuel Price Database," IMF Working Paper, No. 16/254 (2016) at 25 (finding, from study of 162 countries, that on average, a one cent increase in crude oil prices per liter translates to a 1.2 cent increase in retail gasoline prices per liter, meaning a 120% pass-through rate, six months after the shock.).

[110]    The U.S. regions with the fastest speeds, namely the Gulf Coast and Midwest, experience complete pass through in four-to-six weeks. FTC Bureau of Economics, *Gasoline Price Changes and the Petroleum Industry: An Update*, at 38 (2011).

151.    Further, while retail gasoline and diesel prices are often quick to absorb price increases, they tend to react distinctly slower when oil prices decrease.[111] This asymmetrical pass-through dynamic, coined "rockets and feathers," reveals the immediate yet enduring impact of Defendants' artificially inflated gasoline and diesel prices on the commercial purchasers in this Class.[112]

## VIII.    CLASS ACTION ALLEGATIONS

152.    Plaintiffs bring this action on behalf of themselves and under Federal Rule of Civil Procedure 23(a), (b)(1), and (b)(2) as representative of a class of indirect sellers seeking injunctive relief (the "Nationwide Injunctive Relief Class") defined as:

> All persons and entities who purchased retail gasoline or retail diesel fuel for commercial use from a gas station or truck stop in the United States between January 1, 2021 and until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

153.    Plaintiffs also brings this action on behalf of themselves and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf of the following class (the "State Law Class"):

> All persons and entities who purchased retail gasoline or retail diesel fuel for commercial use from a gas station or truck stop in Alabama, Arizona, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, and/or Vermont between January 1, 2021 and until the Defendants' unlawful conduct and its anticompetitive effects cease to persist.

154.    For the purposes of these Class definitions, "purchased … for commercial use" includes all purchases made solely for business purposes, the cost of which was not fully reimbursed to the class member.

---

[111]    Matthew Chesnes, *Asymmetric Pass-Through in U.S. Gasoline Prices*, The Energy Journal, Vol. 1, at 154, 157 (2016), https://www.iaee.org/en/publications/init2.aspx?id=0.

[112]    See Sun, et al., *Asymmetric pass-through of oil prices to gasoline prices with interval time series modelling*, Energy Economics, Vol. 78 (2018) (collecting studies that indicate the asymmetric price pass-through relationship between crude oil prices and gasoline prices), https://doi.org/10.1016/j.eneco.2018.10.027.

155.    Specifically excluded from these Classes are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant. Also excluded from both Classes are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, any business majority-owned by any such person, and any co-conspirator identified in this action.

156.    Both Classes are so numerous as to make joinder impracticable. Plaintiffs do not know the exact number of Class members but the above-defined classes are readily identifiable and are ones for which records should exist. Plaintiffs believe that due to the nature of the product market there are at least millions of members of both Classes in the United States.

157.    Common questions of law and fact exist as to all members of both Classes. Plaintiffs and both Classes were injured by the same unlawful price-fixing conspiracy, and Defendants' anticompetitive conduct was generally applicable to all the members of the Classes, and relief to both Classes as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

    a.    whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, or stabilize the price of crude oil and/or gasoline and diesel fuel in the United States;

    b.    the duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

    c.    whether such combination or conspiracy violated the antitrust and consumer protection laws of various states;

    d.    whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the Plaintiffs and other members of the Class;

    e.    whether Defendants caused Plaintiffs and the Class to suffer damages in the form of overcharges on gasoline and diesel fuel;

f.    the effect of Defendants' alleged conspiracy on the prices of retail gasoline and diesel fuel sold in the United States during the Class Period;

g.    the appropriate Class-wide measure of damages; and

h.    the nature of appropriate injunctive relief to restore competition in the U.S. market for gasoline and diesel fuel.

158.    Plaintiffs' claims are typical of the claims of Class members, and Plaintiffs will fairly and adequately protect the interests of both Classes. Plaintiffs and all members of both Classes are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for gasoline and/or diesel fuel sold in the U.S., resulting from price-fixing in the crude oil market by cartel members.

159.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Classes.

160.    Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

161.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including issues relating to liability and damages.

162.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

163.    Plaintiffs knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## IX.    CLAIMS FOR RELIEF

### A.    VIOLATION OF THE SHERMAN ACT

<u>COUNT 1</u>
VIOLATION OF 15 U.S.C. § 1
(On Behalf of the Nationwide Injunctive Relief Class)

164.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

165.    From at least January 1, 2021, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price for crude oil and retail gasoline and diesel fuel in the United States, including by restraining their respective production volumes, in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

166.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the fixing, raising, and stabilizing of the price of crude oil, retail gasoline, and retail diesel fuel.

167.    The combination and conspiracy alleged herein has had the following effects, among others:

    a.    Price competition in the sale of crude oil has been restrained, suppressed, and/or eliminated in the United States;

    b.    Prices for crude oil sold by defendants and all of their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

c.  Those who purchased retail gasoline or retail diesel fuel indirectly from defendants and their coconspirators for their commercial use have been deprived of the benefits of free and open competition, and paid artificially high prices for gasoline and/or diesel fuel.

168.  Plaintiffs and members of the classes have been injured and will continue to be injured in their businesses and property by paying more for retail gasoline and/or retail diesel fuel purchased indirectly from the defendants and their co-conspirators for their commercial use than they would have paid and will pay in the absence of the combination and conspiracy.

169.  Plaintiffs and members of the classes are entitled to an injunction against defendants, preventing and restraining the violations alleged herein.

**B.    VIOLATIONS OF STATE ANTITRUST LAWS**

170.  Plaintiffs repeat and reiterate the allegations set forth above as if fully set forth herein, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

171.  During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, decrease, stabilize, or maintain at artificially low levels, the production of shale oil in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

172.  In formulating and effectuating this conspiracy, Defendants and their coconspirators performed acts in furtherance of the combination and conspiracy, including: agreeing to fix, decrease, maintain, or stabilize shale oil production at artificially low levels, thereby raising, fixing, and stabilizing crude oil prices, which injured Plaintiffs and members of the Classes; exchange of competitively sensitive information between and among Defendants; and participating in meetings conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

173.  Defendants and their co-conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize crude oil

prices at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Classes were deprived of free and open competition and paid more to purchase gasoline and/or diesel fuel than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

174.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiffs and members of the Classes.

175.    Accordingly, Plaintiffs and the members of the State Law Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's law, injunction (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

176.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust and consumer protection statutes.

177.    In the Counts that follow, a reference to the "Class" is a reference to the State Law Class unless otherwise specified.

## COUNT 2: ALABAMA

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Alabama)**

178.    Due to Defendants' unlawful conduct, (1) competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated within Alabama; (2) gasoline and diesel fuel prices in the State of Alabama were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of ALA. CODE §6-5-60 *et seq*. Defendants' conspiracy substantially affected Alabama commerce and accordingly, Plaintiffs and the members of the Class seek all forms of relief available under ALA. CODE §6-5-60 *et seq*.

## COUNTS 3 & 4: ARIZONA

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Alabama)**

179.    Defendants' conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout Arizona; (2) prices of gasoline and diesel fuel in the State of Arizona were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

180.    Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of ARIZ. REV. STAT. §44-1401 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under ARIZ. REV. STAT. §44-1401 *et seq*.

181.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. Ann. §44-1521 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 5 & 6: CALIFORNIA

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Alabama)**

182.    Defendants' conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout California; (2) gasoline and diesel fuel prices in the State of California were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

183.    Defendants have entered into an unlawful agreement in restraint of trade in violation of CAL. BUS. & PROF. CODE §16700 *et seq*. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce. Each defendant has acted in violation of CAL. BUS. & PROF. CODE §16720 to fix, reduce, stabilize, and maintain crude oil production. The violations of CAL. BUS. & PROF. CODE §16720 consisted, without limitation, of a continuing unlawful trust and concert of action

among Defendants and their co-conspirators, the substantial terms of which were to fix, reduce, maintain, and stabilize the production of domestic shale oil. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the prices of gasoline and diesel fuel. As a result of Defendants' violation of CAL. BUS.&PROF. CODE §16720, Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to CAL. BUS. & PROF. CODE §16750(a).

184.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §17200 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 7 & 8: COLORADO

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Colorado)**

185.    Defendants' conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout Colorado; (2) gasoline and diesel fuel prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers.

186.    Defendants have violated Colo. Rev. Stat. §6-4-101 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under violated Colo. Rev. Stat. §6-4-101, *et seq.*

187.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. §6-1-101 *et seq.* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 9: CONNECTICUT

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Connecticut)**

188.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. §35-24 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout Connecticut, and (2) gasoline prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Conn. Gen. Stat. §35-24 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Conn. Gen. Stat. §35-24 *et seq*.

## COUNTS 10 & 11: DISTRICT OF COLUMBIA

### (On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in District of Columbia)

189.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil,  gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the District of Columbia; (2) gasoline and diesel fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiffs and members of the Class, including those who resided in the District of Columbia and purchased gasoline or diesel fuel in the District of Columbia, paid supracompetitive, artificially inflated prices for gasoline and/or diesel fuel. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

190.    Defendants have entered into agreements in restraint of trade in violation of D.C. CODE §28-4501 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under D.C. CODE, §28-4501 *et seq*.

191.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. CODE, §28-3901 *et seq.,* and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 12 & 13: FLORIDA

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Florida)**

192.    Through their actions and actions of co-conspirators, crude oil, gasoline, and diesel fuel prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, competition in the gasoline and diesel fuel market was restrained, suppressed, and eliminated throughout Florida. Plaintiffs and members of the Class, including those who purchased gasoline or diesel fuel in the State of Florida, paid supracompetitive, artificially inflated prices for gasoline and/or diesel fuel. During the Class Period, Defendants' illegal conduct substantially affected commerce in Florida.

193.    Defendants have violated the FLA. STAT. §542.15 *et seq.*, through their anticompetitive actions. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under FLA. STAT. §542.15 *et seq.*

194.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §501.201 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 14: HAWAII

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Hawaii)**

195.    Defendants have violated Haw. Rev. Stat. Ann. §480-1 *et seq.*, through their actions. *See* HAW. REV. STAT. §§480-4, 480-13. Through Defendants' actions and the actions of their co-conspirators, gasoline and diesel fuel prices in the State of Hawaii were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and the Class. Throughout the Class Period, price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Hawaii. Plaintiffs and members of the Class, including those who resided in the State of Hawaii and purchased gasoline or diesel fuel in Hawaii, paid supracompetitive, artificially inflated prices for their gasoline and/or diesel fuel. During the Class Period, Defendants' illegal conduct substantially affected commerce in

Hawaii. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under HAW. REV. STAT. ANN. §480-1 *et seq.*

## COUNTS 15 & 16: ILLINOIS

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Illinois)**

196.    Defendants' combinations or conspiracies had the following effects: (1) price competition in the crude oil, gasoline, and diesel fuel market was restrained, suppressed, and eliminated throughout the State of Illinois, and (2) gasoline and diesel fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

197.    Defendants have entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. 10/1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under 740 Ill. Comp. Stat. 10/1 *et seq.*

198.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1 *et seq*, and 720 Ill. Comp. Stat. 295/1a, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNT 17: IOWA

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Iowa)**

199.    Defendants have entered into an unlawful agreement in restraint of trade in violation of IOWA CODE §553.1 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) gasoline and diesel fuel prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of IOWA CODE §553.1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under Iowa Code §553.1 *et seq.*

## COUNT 18: KANSAS

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Kansas)**

200.    Defendants have entered into an unlawful agreement in restraint of trade in violation of KAN. STAT. ANN. §50-101 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Kansas; (2) gasoline and diesel fuel prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under KAN. STAT. ANN. §50-101 *et seq*.

## COUNT 19: MAINE

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Maine)**

201.    Defendants have entered into an unlawful agreement in restraint of trade in violation of ME. STAT. TIT. 10, §1101. Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Maine; and (2) gasoline and diesel fuel prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under ME. STAT. TIT. 10, §1104.

## COUNTS 20 & 21: MARYLAND

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Maryland)**

202.    Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Maryland for crude oil, gasoline, and diesel fuel by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized gasoline and diesel fuel prices in the State of Maryland at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

203.    Defendants violated the MD. CODE ANN., COM. LAW §11-201 *et seq.*, by entering into unlawful agreement in restraint of trade in the State of Maryland. Accordingly, Plaintiffs and members of the Class seek all relief available under MD. CODE ANN., COM. LAW §11-201 *et seq.*

204.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Code Ann., Com. Law §13-101 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 22 & 23: MICHIGAN

### (On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Michigan)

205.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Michigan, and (2) gasoline and diesel fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

206.    Defendants have entered into an unlawful agreement in restraint of trade in violation of MICH. COMP. LAWS §445.771 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under MICH. COMP. LAWS §445.771 *et seq.*

207.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws §445.903 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 24 & 25: MINNESOTA

### (On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Minnesota)

208.    Through their actions and actions of co-conspirators, gasoline and diesel fuel prices in the State of Minnesota were raised, fixed, maintained, and stabilized at an artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, price competition in the market for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Minnesota. Plaintiffs and members of the Class, including those who resided in the State of Minnesota and purchased gasoline or diesel fuel there, paid

supracompetitive, artificially inflated prices for gasoline and/or diesel fuel. During the Class

Period, Defendants' illegal conduct substantially affected commerce in the State of Minnesota.

209.    Defendants have violated the MINN. STAT. §325D.49 *et seq*., through their

anticompetitive actions. Accordingly, Plaintiffs and members of the Class seek all forms of relief

available under MINN. STAT. §325D.49 *et seq.*

210.    Defendants have engaged in unfair competition or unfair or deceptive acts or

practices in violation Minn. Stat. Minn. Stat. §325d.43-48 *et seq*., and, accordingly, Plaintiffs and

members of the Class seek all relief available under that statute.

## COUNT 26: MISSISSIPPI

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Mississippi)**

211.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of MISS. CODE ANN. §75-21-1 *et seq. See* Miss. Code Ann. §75-57-63. Defendants'

combinations or conspiracies had the following effects: (1) price competition for crude oil,

gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of

Mississippi, and (2) gasoline and diesel fuel prices were raised, fixed, maintained, and stabilized

at artificially high levels throughout the State of Mississippi. During the Class Period,

Defendants' illegal conduct substantially affected the State of Mississippi commerce.

Accordingly, Plaintiffs and members of the Class seek all relief available under MISS. CODE

ANN. §75-21-1 *et seq*., and MISS. CODE ANN. §75-57-63.

## COUNTS 27 & 28: NEBRASKA

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Nebraska)**

212.    Defendants' combinations or conspiracies had the following effects: (1) price

competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated

throughout the State of Nebraska, and (2) gasoline and diesel fuel prices were raised, fixed,

maintained, and stabilized at artificially high levels throughout the State of Nebraska. During the

Class Period, Defendants' illegal conduct substantially affected the State of Nebraska commerce.

213.    Defendants restrained trade and commerce in the State of Nebraska by entering

into an unlawful agreement in violation of NEB. REV. STAT. §59-801 *et seq*. Accordingly,

Plaintiffs and members of the Class seek all relief available under NEB. REV. STAT. §59-801 *et seq*.

214.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §59-1601 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 29 & 30: NEVADA

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Nevada)**

215.    Defendants' conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Nevada; (2) gasoline and diesel fuel prices in the State of Nevada were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

216.    Defendants violated the Nev. Rev. Stat. Ann. §598A.210 *et seq*., by entering into unlawful agreement in restraint of trade in the State of Nevada. As a result of Defendants' violation of Nev. Rev. Stat. Ann. §598A.210 *et seq*. Plaintiffs and members of the Class seek treble damages and their cost of suit, including a reasonable attorneys' fee, pursuant to Nev. Rev. Stat. Ann. §598A.210.

217.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. §598.0903 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

## COUNTS 31 & 32: NEW HAMPSHIRE

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in New Hampshire)**

218.    Defendants' combinations or conspiracies detrimentally affected the price competition in the State of New Hampshire crude oil, gasoline, and diesel fuel market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized gasoline and diesel fuel prices in the State of New

Hampshire at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected the State of New Hampshire commerce.

219.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. REV. STAT. ANN. §356:1 *et seq.* Accordingly, Plaintiffs and members of the Class seek all relief available under N.H. REV. STAT. ANN. §356:1 *et seq.*

220.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. §358-A:1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNTS 33 & 34: NEW MEXICO

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in New Mexico)**

221.    Defendants' combinations or conspiracies detrimentally affected the price competition in the State of New Mexico for crude oil, gasoline, and diesel fuel by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained and stabilized gasoline and diesel fuel prices in the State of New Mexico at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of New Mexico.

222.    Defendants violated the N.M. STAT.ANN. §57-1-1 *et seq.*, by entering into unlawful agreement in restraint of trade in the State of New Mexico. Accordingly, Plaintiffs and Members of the Class seek all relief available under N.M. STAT. ANN. §57-1-1 *et seq.*

223.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. §57-12-1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNT 35: NEW YORK

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in New York)**

224.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. GEN. BUS. LAW §340 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for crude oil, gasoline, and diesel fuel was

restrained, suppressed, and eliminated throughout the State of New York, and (2) gasoline and diesel fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of New York. During the Class Period, Defendants' illegal conduct substantially affected the State of New York commerce. The conduct set forth above is a *per se* violation of the Donnelly Act, N.Y. GEN. BUS. LAW §340 *et seq*. Accordingly, Plaintiffs and members of the Class seek all relief available under N.Y. GEN. BUS. LAW §340 *et seq.*

## COUNT 36: NORTH CAROLINA

### (On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in North Carolina)

225.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. GEN. STAT. §75-1 *et seq*. Defendants' combinations or conspiracies had the following effects: (1) price competition in the market for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of North Carolina, and (2) gasoline and diesel fuel prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of North Carolina. During the Class Period, Defendants' illegal conduct substantially affected the State of North Carolina commerce. Accordingly, Plaintiffs and members of the Class seek all relief available under N.C. GEN. STAT. §75-1 *et seq.*

## COUNT 37: NORTH DAKOTA

### (On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in North Dakota)

226.    Defendants' actions have violated the N.D. CENT. CODE §51-08.1-01 *et seq*. through their anticompetitive actions. Through their actions and actions of co-conspirators, gasoline and diesel fuel prices in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, price competition in the market for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of North Dakota. Plaintiffs and members of the Class, including those who resided in the State of North Dakota and purchased gasoline or diesel fuel there, paid supracompetitive, artificially inflated prices. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of North Dakota.

Accordingly, Plaintiffs and members of the Class seek all forms of relief available under N.D. CENT. CODE §51-08.1-01 *et seq*.

### COUNTS 38 & 39: OREGON

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Oregon)**

227.    Defendants' combinations or conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Oregon; (2) gasoline and diesel fuel prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected the State of Oregon commerce.

228.    Defendants have entered into an unlawful agreement in restraint of trade in violation of OR. REV. STAT. §646.725 *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under OR. REV. STAT. §646.725 *et seq*.

229.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. §646.605 *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNTS 40 & 41: RHODE ISLAND

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Rhode Island)**

230.    Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Rhode Island for crude oil, gasoline, and diesel fuel market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized gasoline and diesel fuel prices in the State of Rhode Island at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Rhode Island.

231.    Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. Gen. Laws §6-36-7 *et seq*. Accordingly, Plaintiffs and Members of the Class seek all relief available under R.I. Gen. Laws §6-36-7 *et seq*.

232.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws §6-13.1-1, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNTS 42 & 43: SOUTH DAKOTA

#### (On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in South Dakota)

233.    Through their actions and actions of co-conspirators, gasoline prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the Class. Throughout the Class Period, price competition in the market for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of South Dakota. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of South Dakota. Plaintiffs and members of the Class, including those who resided in the State of South Dakota and purchased gasoline or diesel fuel there, paid supracompetitive, artificially inflated prices for their gasoline and/or diesel fuel.

234.    Defendants have violated S.D. CODIFIED LAWS §37-1-3.1 *et seq.*, through their anticompetitive actions. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under S.D. CODIFIED LAWS §37-1-3.1 *et seq.*

235.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws §37-24-1 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

### COUNT 44: TENNESSEE

#### (On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Tennessee)

236.    Defendants have entered into an unlawful agreement in restraint of trade in violation of TENN. CODE ANN. §47-25-101 *et seq.* Defendants' combinations or conspiracies had the following effects: (1) price competition for the sale of gasoline and diesel fuel, tangible goods, was restrained, suppressed, and eliminated throughout the State of Tennessee; (2) prices for gasoline and diesel fuel, tangible goods, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of

free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Tennessee. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under TENN. CODE ANN. §47-25-101 *et seq.*

### COUNT 45: UTAH

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Utah)**

237.    Defendants violated the UTAH CODE ANN. §76-10-3101 *et seq.* by entering into unlawful agreement in restraint of trade in the State of Utah. Specifically, Defendants' combinations or conspiracies detrimentally affected the price competition in the State of Utah for the crude oil, gasoline, and diesel fuel market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized gasoline and diesel fuel prices in Utah at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Utah. Accordingly, Plaintiffs and Members of the Class seek all relief available under UTAH CODE ANN. §76-10-3101 *et seq.*

### COUNT 46: VERMONT

**(On Behalf of Class Members that Purchased Retail Gasoline or Diesel Fuel in Vermont)**

238.    Defendants combinations or conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and eliminated throughout the State of Vermont; (2) gasoline and diesel fuel prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition. Defendants have entered into an unlawful agreement in restraint of trade in violation of VT. STAT. ANN. TIT. 9, §2453 *et seq.* During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Vermont. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under VT. STAT. ANN. TIT. 9, §2465 *et seq.*

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully requests that:

A.     The Court determine that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b)(3), appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Class, once certified;

B.     The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal as a quick look or full-fledged rule of reason violation) of various state antitrust and competition laws as alleged above;

C.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E.     The Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## XI.    JURY TRIAL DEMANDED

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated:  January 22, 2024                    By: /s/ Robert T. Eglet
                                            Robert T. Eglet; NV Bar No. 3402
                                            Artemus W. Ham, IV; NV Bar No. 7001
                                            Erica D. Entsminger; NV Bar No. 7432
                                            **EGLET ADAMS EGLET HAM & HENRIOD**
                                            400 South Street, Suite 400
                                            Las Vegas, Nevada 89101
                                            Telephone: (702): 450-5400
                                            Facsimile: (702) 450-5451
                                            eservice@egletlaw.com

                                            *Proposed Counsel for Plaintiffs and the Proposed Class*

                                            Brent W. Johnson (*pro hac vice* forthcoming)
                                            Benjamin Brown (*pro hac vice* forthcoming)
                                            Robert W. Cobbs (*pro hac vice* forthcoming)
                                            Nina Jaffe-Geffner (*pro hac vice* forthcoming)
                                            **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                            1100 New York Avenue NW, 5th Floor
                                            Washington, DC 20005
                                            Telephone: (202) 408-4600
                                            Facsimile: (202) 408-4699
                                            bjohnson@cohenmilstein.com
                                            bbrown@cohenmilstein.com
                                            rcobbs@cohenmilstein.com
                                            njaffegeffner@cohenmilstein.com

                                            Michael Eisenkraft (*pro hac vice* forthcoming)
                                            Christopher Bateman (*pro hac vice* forthcoming)
                                            Aaron Marks (*pro hac vice* forthcoming)
                                            **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                            88 Pine Street, 14th Floor
                                            New York, New York 10005
                                            Telephone: (212) 883-7797
                                            meisenkraft@cohenmilstein.com
                                            cbateman@cohenmilstein.com
                                            amarks@cohenmilstein.com

                                            *Proposed Interim Counsel for Plaintiffs and the Proposed Class*